# EXHIBIT 1

**IN THE MATTER OF AN ARBITRATION**          **CASE No. UNC 211/ELU**


**UNDER THE UNCITRAL ARBITRATION RULES as in force in 2013**


**BETWEEN**


**UNICON LTD**

                                                  **Claimant**


**AND**


**GOVERNMENT OF AFGHANISTAN**
**(MINISTRY OF ENERGY AND WATER)**
**(AFGHANISTAN)**

                                                  **Respondent**

---

**FINAL AWARD**
**Paris, 23 November 2022**

---


**Arbitral Tribunal**


**Dr Sally EL SAWAH**
*Sole Arbitrator*


**1**

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................ 4

   A.   *The Parties and Their Representatives* ................................................ *4*

      1.   **The Parties and Their Representatives** .........................................**4**

      2.   **Communication** ............................................................................**6**

   B.   *The Arbitral Tribunal* ....................................................................... *7*

II.  **BRIEF DESCRIPTION OF THE CONTRACTUAL RELATIONSHIP AND CLAIMANT'S POSITION** ................................................................ **8**

   A.   *The Contract of Consultant's Service ("The Contract")* ...................... *8*

   B.   *Brief Description of Claimant's Position and Claims* ........................ *10*

III. **THE ARBITRATION AND CHOICE-OF-LAW AGREEMENTS** ................. **13**

   A.   *The Arbitration Agreement* .............................................................. *13*

   B.   *The Choice-Of-Law Agreement* ........................................................ *16*

   C.   *The Procedural Rules: The UNCITRAL Arbitration Rules 2013* ......... *16*

IV.  **HISTORY OF THE ARBITRATION PROCEEDINGS** ............................. **17**

V.   **SUMMARY OF FACTS AND ISSUES** ................................................. **34**

VI.  **THE TRIBUNAL'S DECISION** ......................................................... **39**

   A.   *Procedural Matters* ......................................................................... *39*

      1.   **The Seat of Arbitration** ..............................................................**39**

      2.   **On the Date of Commencement of the Arbitration, Article 2 of the UNCITRAL Rules and the Parties' Agreement on the Communication by Email** ....................................................................................**40**

         a.   Claimant's Position ...............................................................**41**

         b.   The Tribunal's Decision .........................................................**42**

   B.   *Jurisdiction* .................................................................................... *47*

      1.   **The Claimant's position** ............................................................**47**

      2.   **The Tribunal's Decision** ............................................................**47**

   C.   *The Merits* ...................................................................................... *51*

      1.   **On Claimant's Claim for Unpaid Invoices** ................................**51**

         a.   The Claimant's Position .........................................................**51**

         b.   The Tribunal's Decision .........................................................**51**

      2.   **On Claimant's Claim for the amounts of Amendment No. 4 & the No-Charge Services** ......................................................................**54**

      3.   **On Claimant's Claim for Additional Compensation for Harmful Actions, Extortion and Long-Term Harassment** ...........................**59**

**4.   On the Claim for Interest** ...................................................................................**60**

*D.   Costs of the Arbitration*........................................................................... *62*

   **1.   Claimant's Position** ............................................................................**62**

   **2.   The Tribunal's Decision** ...................................................................**62**

**VII. DECISION**.................................................................................................. **63**

**ANNEXES** ........................................................................................................ **65**

*Annex 1*.................................................................................................... *65*

*Annex 2*.................................................................................................... *66*

## I.     INTRODUCTION

1.   This Award is rendered in the arbitration proceedings commenced under the UNCITRAL Arbitration Rules as in force in 2013 ("the UNCITRAL Rules") by UNICON Limited, ("Unicon" or "Claimant") against the GOVERNMENT OF AFGHANISTAN, represented by the MINISTRY OF ENERGY AND WATER ("MEW" or "Respondent").

2.   The Claimant and the Respondent are referred to collectively as "the Parties", and each of them individually as a "Party".

### A.     The Parties and Their Representatives

#### *1.   The Parties and Their Representatives*

3.   **Claimant** is UNICON Limited, and its contact details are:

85 Great Portland Street
London W1W 7LT
United Kingdom

4.   Claimant's authorised representative is Mr. John Newsome, its Director and Shareholder, whose contact details are:

John Newsome
T: +44 203918 8747
E: jnewsome@unicon-international.com
W: www.unicon-international.com

5.   Claimant has designated Mr. Rustam Davletkhan as its legal advisor. Mr Davletkhan's contact details are:

Rustam Davletkhan
85 Great Portland Street
London W1W 7LT
United Kingdom
T: +44 203 918 8747
M: +44 7787 028 486
E: rustam@unicon-international.com

6.   On 16 February 2022, Claimant submitted a letter of "confirmation of representation" confirming that UNICON was the Claimant in these proceedings and that it has appointed Mr Daveltkhan as its legal advisor. The letter was signed by its director and shareholder, Mr. John Newsome.

7.  **Respondent** is the Ministry of Energy and Water of Afghanistan, the Islamic Republic of Afghanistan. According to Article 9.1 of the General Conditions of Contract ("GCC") and Article 9.1 of the Special Conditions of Contract ("SCC"), and the Laws of Afghanistan, Respondent's duly authorized representative to act and represent the Ministry of Energy and Water is its Minister of Energy and Water and its Procurement Director.

    Claimant submitted that although the MEW enjoys a separate legal personality, it is an administrative unit of the Government of Afghanistan such that it is the Government which is in fact the party to the Contract and the arbitration proceedings. This is issue will be decided by the Arbitral Tribunal under the section on Jurisdiction.[1]

8.  According to Articles 6.1 and 6.2 of the GCC and Articles 6.1 and 6.2 of the SCC, Respondent's contact details are:

    Darulaman Road, Sanatoruim,
    Kabul, Afghanistan
    Facsimile: +93(0) 788082208
    Att.: Procurement Director

9.  Claimant requested that any correspondence to Respondent in this arbitration be directed by email to the following persons as the designated point of contact in accordance with Articles 6.1 and 6.2 SCC:

    **Mr. Abrahim Abram**
    abrahim.abram@mew.gov.af
    abrahim.abram@gmail.com

    **Mr. Arif Alyasi**
    arifalyasi@hotmail.com

    **Mr. Reshad Hakim**
    ahmadreshadhakim@gmail.com

    **Mr. Wais Basiri**
    waisbasiri@gmail.com

    **Mr. Dawood Mirzaee**
    dmirzaee@gmail.com

---

[1] See, Section VI. B.

**5**

**Mr. Hamidullah Fahim**
hfahim200@gmail.com

**Mr. Kabir Isakhel**
kabir.isakhel@aop.gov.af

**Mr Saidataullah Seddiqi**
saidataullah.seddiqi@gmail.com

10. During the course of this arbitration, upon Claimant's request and the Sole Arbitrator's authorisation, the above list of Respondent's designated point of contact was extended to include: info@mew.gov.af .

11. Respondent has not participated in the proceedings either in person, or by designating a legal adviser to act on its behalf.

### 2. Communication

12. Whereas communication with Claimant was done by email only, communication with Respondent was done by email and courier.

13. In its email of 10 March 2022, Claimant informed the Tribunal that it has attempted to serve the hard copy of the Notice of Arbitration to Respondent by Fedex on 10 November 2021 at the address designated by Articles 6.1 and 6.2 of the GCC and the SCC,[2] but it was *"informed by international couriers, after August 2021, that there are logistical problems in any delivery of post to/from Afghanistan. The same difficulty remains in place today as well, to the best of Claimant's knowledge".*

14. The Sole Arbitrator has also faced the same difficulties and was also unable to send to Respondent any courier by Fedex, DHL or Chronopost at Respondent's post mail address in Kabul, Afghanistan during the proceedings. The courier service providers specified that they were unable to provide any services to Afghanistan due to the war.[3] This impediment persisted throughout the proceedings.

15. The Sole Arbitrator thus addressed the communication on procedural matters to Respondent's Embassy in Paris, France, and instructed Claimant to address any submissions or exhibits to Respondent by email and by courier to the address of

---

[2] Exhibit 2 to Claimant's Application to the ICC of 22 November 2021.

[3] See Fedex's email to the Sole Arbitrator of 3 March 2022, Annex 1.

**6**

Respondent's Embassy in France too, so long as the obstacles relating to courier services to Afghanistan persisted.

16. The address of Respondent's Embassy in Paris, France is:

L'Ambassade de la R.I. d'Afghanistan en France
Attn. to Honorable Ambassador AZIZI
32, avenue Raphaël, 75016 Paris, France

## B. The Arbitral Tribunal

17. Claimant commenced the arbitration proceedings against Respondent by serving a notice of Arbitration (the "NoA" or the "Notice of Arbitration") dated 17 September 2021.

18. According to Claimant, the Notice of Arbitration was served to Respondent by email on 18 and 19 September 2021 as demonstrated by Claimant's email exchange with Mr. Khan Mohammad Takal and other officials of Respondent on these dates.[4] Claimant stated that Mr. Takal was the MEW's Deputy Minister from 12 October 2018 to 9 January 2020 and then became the MEW's Minister until 7 September 2021.

19. On 22 November 2021, Claimant submitted an Application to the Secretariat of the International Chamber of Commerce in Paris ("the ICC Secretariat") requesting a service in accordance with the Rules of ICC as appointing authority in UNCITRAL or other Arbitration Proceedings, in force as of 1st January 2018 (the "Rules"). In this Application, Claimant requested the appointment of a sole arbitrator to decide the dispute. It indicated that it has dispatched a copy of the Application in advance by Fedex on 10 November 2021 to supplement email communication and submitted exhibits thereof to support this statement.[5]

20. On 23 November 2021, the ICC Secretariat acknowledged receipt of the Application.

21. By email of 8 December 2021, the ICC Secretariat notified Respondent of Claimant's Application to appoint a Sole Arbitrator and the documents attached thereto and granted Respondent until 22 December 2021, to submit its comments thereon, including Claimant's suggestion to appoint Mr. Mohamed Shelbaya and its proposal that the ICC Secretariat proceeds directly to the appointment of a sole arbitrator without applying the list-procedure as set out under Articles 6(2) and 6(3) of the Rules of ICC as Appointing Authority in UNCITRAL or Other Arbitration Proceedings. It was specified in this letter that *"Responding Party is invited to provide its email address/es as the Secretariat generally transmits correspondence by email."*

---

[4] Exhibit 8 to Claimant's Application to the ICC of 22 November 2021.

[5] Application of 22 November 2021, ¶ 1.3.

22. On 19 January 2022, the Secretariat acknowledged receipt of Dr. Sally El Sawah's Statement of acceptance, availability and impartiality and independence to serve as Sole Arbitrator.

23. On 27 January 2022, the International Court of Arbitration of the International Chamber of Commerce, acting in its capacity of Appointing Authority, confirmed the appointment of Dr. Sally El Sawah to serve as Sole Arbitrator in this matter pursuant to Articles 6(1) (a) and 8 of the UNCITRAL Rules.

24. On 28 January 2022, the Secretariat transmitted the file to the Arbitral Tribunal pursuant to Article 16 of the Rules and informed the Parties accordingly by a letter of the same date.

25. Dr. Sally El Sawah's contact details are:

> **Dr. Sally El Sawah**
> Junction
> 45, rue Raffet
> 75016 Paris
> France
> T: +33785253833
> E: ses@junction-law.com

## II.  BRIEF DESCRIPTION OF THE CONTRACTUAL RELATIONSHIP AND CLAIMANT'S POSITION

26. After a brief description of the Contract (A), the Tribunal shall make a brief description of the facts and claims under dispute (B).

### A.  The Contract of Consultant's Service ("The Contract")

27. The relationship between the Parties arose in the context of a World Bank Group's ("WBG") financed Project ("the CASA-1000 Project") for the generation, transmission and distribution of electricity between two regions, Central Asia and South Asia. The purpose was the development of a cross-border transmission interconnection linking the countries of the concerned regions to facilitate the transfer of surplus power between the regions. The CASA-1000 Project aimed to transfer up to 1,300MW of electricity between the Central Asia and South Asia concerned countries in furtherance of their development.[6] The total project cost was originally estimated at USD 953 million, which was then increased to USD 1.2 billion.

28. According to Claimant, the Project was highly complex in nature and included numerous financing partners (the World Bank, the Asian Development Bank, etc.). Each of the

---

[6] SOC ¶ 13 ff.

**8**

participating countries pursued its own national interests (conflicting with others) and required agreements of all parties on technical, legal, commercial and financial matters. The terms of agreements kept changing by the stakeholders requiring constant amendments to volume of documents and exchange of detailed documents and communications. Therefore, each of the participating countries had its own team of international advisors. The negotiation process required permanent presence of advisory support. This Project was of particular importance to Afghanistan as it would have provided it with the needed electricity as well as income from transit fees and more.[7]

29.    In this context, Respondent issued a call for tenders seeking international advisors to assist it in the ongoing negotiation process of the CASA-1000 Project. On 13 April 2013, Claimant submitted to Respondent its expression of interest ("EOI")[8] in response to Respondent's call for tenders. On the following day, 14 April 2013, Respondent acknowledged receipt of Claimant's EOI.[9]

30.    On 6 August 2013, Claimant received an official email from Respondent's Procurement team, Mr Hashimi, inviting Claimant to submit the final tender documents.[10]

31.    On 12 October 2013, Claimant entered into a Contract with Respondent for the provision of Transaction Advisory Services for Central Asia –South Asia Transmission Project ("CASA-1000" or "Project") for the Ministry of Energy and Water ("MEW") in Afghanistan, Contract No: MEW/005/92/CQS ("Contract"). According to Claimant,[11] the Contract formed part of the Grant Financing Agreement signed between the Islamic Republic of Afghanistan and the World Bank Group specifically for the purposes of this Contract. In fact, the Contract's objectives as defined under the Contract adopt the same wordings as under the Grant Financial Agreement between the WBG and the State of Afghanistan.[12]

32.    The Contract's original term was six months, from 12 October 2013 to 12 April 2014, with a provision that *"the client has the option of extending this contract if required."*[13] According to Claimant,[14] it was obvious from the beginning that Contract's initial six months was only the starting point.

---

[7] SOC ¶ 26.

[8] SOC ¶ 16.

[9] Exhibit C-12.

[10] Exhibit C-16. SOC ¶ 20.

[11] SOC ¶ 2.

[12] SOC ¶ 17. Appendix A, p. 34 of the Contract (Exhibit C-01) and Article 2.01, p. 4 of the Grant Agreement (Exhibit C-02).

[13] SOC ¶ 3. See Article 14.1 SCC, Exhibits C-01, as well as Exhibits C-05, C-06 and C-07.

[14] SOC ¶ 26.

33. On 27 October 2013,[15] Claimant received the Contract and the Minutes of negotiations[16] from Mr Hashimi, with a copy addressed to the Minister of Energy & Water and the World Bank Group.

34. The Contract comprised General Conditions of Contract ("GCC") supplemented with Special Conditions of Contract ("SCC"). The Contract's initial term (between 12 October 2013 to 12 April 2014) was then modified/extended through:[17]

    - Contract Amendment No.1 ("Amendment No.1") to cover the period from 24 May to 24 August 2014 (3 months);

    - Contract Amendment No.2 ("Amendment No.2") from 24 October 2014 to 24 February 2015 (4 months); and

    - Contract Amendment No.3 ("Amendment No.3") from 25 February to 25 June 2015 (4 months).

35. In addition, Claimant submitted that it provided services to Respondent during two additional periods without the Parties signing amendments, the first between the initial Contract and Amendment no.1, for 41 days (between 13 April 2013 and 23 May 2014), and the second between Amendments no. 1 and no. 2, for 60 days (between 24 August 2014 and 23 October 2013).

36. The respective Contract Amendments also amended some of the Contract's clauses. The last of the amendments –Amendment No.3 – in particular, amended clauses Nos. 14.1, 38.1, 39.1, 39.2, 41 and 42.1.[18]

37. According to Claimant, other amendments were expected to be concluded between the Parties, including an Amendment no. 4, which was never concluded because of Respondent's deliberate obstruction.

   **B.   Brief Description of Claimant's Position and Claims**

38. Claimant submitted that Respondent has undertaken to entrust it with consultancy services for a total amount of USD 3,000,000, which were granted by the WBG to Respondent under the CASA-1000 towards its Contract with Claimant. It put forward that it was Respondent who informed it of its Grant Financing Agreement with the WBG[19] that allocated USD 3,000,000 towards this Contract. Claimant referred to an email of 27 September 2014, where Mr. Qazizadah, Respondent's Deputy Minister of

---

[15] Exhibit C-17.

[16] Exhibit C-22.

[17] SOC ¶ 30 and ¶ 34.

[18] SOC ¶¶ 2-3.

[19] Exhibit C-2.

Energy and Water wrote to Claimant: *"I told you that we have $3 million for your contract from the WB, it will all be paid to you through such extensions. We cannot do more than 3 or 4 months extension at a time because of budget ceiling per amendment **but you will receive all $3 million by the end**. This is good contract, and you will have more so please do the necessary and be patient."*[20]

39.    Claimant added that notwithstanding this undertaking, Respondent never signed Amendment No.4 as Mr Qazizadah fell ill and did not attend the ministry since the second half of 2015, and his successors did not honour Respondent's agreements previously made.

40.    Claimant submitted that Respondent did not honour its payment obligations either and applied *"hostage-taking tactics"* against it by effectively turning Claimant into a *"commercial slave"*. All the invoices starting from Amendment No. 2 were pending with the MEW and were partially released only on 26 August 2016, (Amendment No.2 only), i.e., after a meeting between the Parties in June 2016. Amendment No.3 invoice was never paid at all. Thus, Claimant found itself in a situation where should it not perform after expiration of Amendment No.3, then it would never be paid for both Amendments Nos. 2 and 3.[21]

41.    Claimant's position is that Respondent has deliberately not met its obligations towards it as a measure of retaliation pursuant to Claimant's persistent refusal to pay bribes.[22] It submitted that Respondent has tried since the negotiation phase of the Contract to extort bribes from Claimant. Thus, on 14 April 2013, just 11 hours after Respondent's email confirming receipt of Claimant's EOI, Claimant received an unexpected email from someone named Muhamad Daud with the following content: *"I think you apply for casa 1000 project in mew, if you want i can help you".*[23] Several similar emails followed, including one received on 8 June 2013 from allegedly[24] the MEW's representative, Mr. Kamran, with the following content: *"Eight companies submitted there [sic] EOI for the above project, I want to short list you and other 2 companies from 8 companies, and I can also help in the evaluation of technical proposal as well. If you are agree let's deal".* Claimant simply ignored all these emails.[25] Other solicitation of bribes followed and were simply ignored by Claimant.[26]

---

[20] SOC ¶ 43, Exhibit C-36 (email exchange between Claimant and Respondent, 26-27 September 2014). Emphasis added.

[21] SOC ¶ 47.

[22] Application ¶ 2.4.4.

[23] Exhibit C-13.

[24] The electronic signature only mentioned "Ministry of Energy and Water – Afghanistan", without any further indication. SOC ¶ 4.

[25] Exhibit C-14.

[26] Exhibit C-15. SOC ¶ 19.

42. Failing on extortion, after the conclusion of the Contract, Mr. Hashimi arranged a meeting with the MEW's Procurement Director, Mr. Jabarkhel, in December 2013, which was recorded by Claimant on audio without Respondent's knowledge at that time. Three participants were present: (1) Mr. Davletkhan for Claimant; (2) Mr. Waliullah Jabarkhel, Respondent's Procurement Director; and (3) Mr. Hashimi, Respondent's Procurement Advisor. During this meeting, requests of bribes were explicitly made, which Claimant firmly objected to, and threats were thus made pursuant to these objections.[27]

43. Claimant submitted that, in mid-January 2014, halfway of the Contract's original duration where four invoices have already been submitted, the MEW's Procurement Department then executed its earlier threats made by the MEW's procurement team during the December 2013 meeting. Thus, the MEW's Procurement Director, Mr. Jabarkhel, initiated harassment against Claimant, insisting, on the one hand, on the unilateral reduction of the Contract's value, and on the other hand, not paying the amount of the invoices in full.[28] Claimant nonetheless resisted and on 24 January 2014, it reported the whole matter to the then MEW's Chief of Staff, Mr. Lashkari.[29] Notwithstanding the promise of the then Deputy Minister, Mr. Qazizadah, to handle this problem personally,[30] the MEW Procurement Directorate eventually implemented its threats and the suspension of payments and the obstructions and delays to the conclusion of amendments resumed after Mr. Qazizadah's departure.

44. Based on these facts, Claimant sought the following relief from the Sole Arbitrator:[31]

   a) DECLARE that the Government of Afghanistan, represented by its Ministry of Energy and Water, acted on behalf of the State and the State is ultimately liable for the actions of its Government and the outcome of these arbitral proceedings;

   b) ORDER the Respondent to pay the Claimant the amount of unpaid invoice under Amendment No.3 in the amount of USD 444,807;

   c) ORDER the Respondent to pay the Claimant the amount of direct damage and loss arising from would-be Amendment No.4 in the amount of USD 444,807;

---

[27] SOC ¶ 20, Exhibits C-18 to 21.

[28] SOC ¶ 22.

[29] Exhibit C-23. It results from the Minutes of the Contract negotiations that Mr. Lashkari was also the MEW's "Deputy Coordinator of Working Group for CASA1000", Exhibit C-22.

[30] SOC ¶ 25.

[31] SOC ¶ 86. The Tribunal will decide on the relief sought in the last submissions filed by Claimant where it stated its claims, i.e., the Statement of Claim, and not in the Notice of Arbitration (NoA ¶ 43). For the sake of clarity, Claimant did not make any claims in its Answers to the Tribunal's Questions.

d)    ORDER the Respondent to pay the Claimant the amount of damages caused during 2014 in the amount of USD 275,972;

e)    ORDER the Respondent to pay the Claimant interest on items (b) to (d) above in the amount of USD 575,471 comprising of:

    (i)    USD 299,433 in the unpaid Amendment No.3 invoice;

    (ii)   USD 160,130 in the unpaid and would-be Amendment No.4;

    (iii)  USD 115,908 in the damages caused in 2014;

f)    ORDER the Respondent to pay the Claimant additional compensations arising from Respondent's harmful actions, extortion and long-term harassment in the amounts to be determined by the Arbitrator;

g)    ORDER that the Respondent pay all of the Claimant's costs incurred in relation to the proceedings, including legal and representative fees and expenses;

h)    ORDER that the Respondent pay all of the costs of this arbitration, including Arbitrator's fees, ICC costs and other such expenses;

i)    ORDER the Respondent to pay the Claimant applicable pre-and post-award interest; and

j)    ORDER such other relief as the Tribunal may deem appropriate.

## III.    THE ARBITRATION AND CHOICE-OF-LAW AGREEMENTS

### A.    The Arbitration Agreement

45.    Claimant invoked the Arbitration Agreement under Article 45 of the General Conditions of the Contract (the "GCC") which provides that:

> *"Any disputes between the Parties arising under or related to this contract that cannot be settled amicably may be referred to by either Party to the adjudication/arbitration in accordance with the provisions specified in the SCC (Special Conditions of Contract)."*

46.    Article 45.1 of the Special Conditions of the Contract provides that:

> *"Disputes shall be settled by arbitration in accordance with the following provisions;*

*1-Selection of Arbitrators: Each dispute submitted by a Party to arbitration shall be heard by a sole arbitrator or an arbitration panel composed of three (3) arbitrators, in accordance with the following provisions;*

    *a.  Where the Parties agree that the dispute concerns a technical matter, they may agree to appoint a sole arbitrator or, failing agreement on the identity of such sole arbitrator within (30) days after receipt by the other Party of the proposal of a name for such an appointment by the Party who initiated proceedings, either Party may apply to the Federation Internationale des Ingénieurs-Conseil (FIDIC) of Lausanne, Switzerland for a list of not fewer than five (5) nominees and, on receipt of such list, the Parties shall alternately strike names therefrom, and the last remaining nominee on the list shall be the sole arbitrator for the matter in dispute. If the last remaining nominee has not been determined in this manner within sixty (60) days from the date of the list, the Secretary General of the Permanent Court of Arbitration shall appoint, upon the request of either Party and from such list or otherwise, a sole arbitrator of the matter in dispute.*

    *b.  Where the Parties do not agree that the dispute concerns a technical matter, the Client and the Consultant shall each appoint one (1) arbitrator, these two arbitrators shall jointly appoint a third arbitrator, who shall chair arbitration panel. If the arbitrators named by the Parties do not succeed in appointing a third arbitrator within thirty (30) days after the latter of the two (2) arbitrators named by the Parties has been appointed, the third arbitrator shall, at the request of either Party, be appointed by Secretary General of the International Centre for Settlement of Investment Disputes, Washington, D.C.*

    *c.  If a dispute subject to paragraph (b) above, one Party fails to appoint its arbitrator within thirty (30) days after the other Party has appointed its arbitrator, the Party which has named an arbitrator may apply to the International Chamber of Commerce, Paris; to appoint a sole arbitrator for the matter in dispute, and the arbitrator appointed pursuant to such application shall be the sole arbitrator for that dispute.*

*2- Rules of Procedure. Except as otherwise stated herein, arbitration proceedings shall be conducted in accordance with the rules of procedure for arbitration of the United Nations Commission on*

**14**

International Law (UNICITRAL) as in force on the date of this Contract.

3- *Substitute Arbitrator*. If for any reason an arbitrator is unable to perform his/her function, a substitute shall be appointed in the manner as the original arbitrator.

4- *Nationality and Qualifications of Arbitrators*. The Sole Arbitrator or the third arbitrator appointed pursuant to paragraphs 1(a) through 1(c) above shall be an internationally recognised legal or technical expert with extensive experience in relation to the matter in dispute shall not be a national of the Consultant's home country UK, or of the home country of any of their members or Parties] or of the Government's country. For the purpose of this Clause, "home county" means any of;

    a.  the country of incorporation of the Consultant [If the Consultant consists of more than one entity, add: or of any of their members or parties]; or

    b.  the country in which the Consultant's [any of their member's or Parties] principal place of business is located; or

    c.  the country or nationality of a majority of the Consultant's [or of any member's Parties'] shareholders' or

    d.  the county or nationality of the Sub-consultants concerned where dispute involves a subcontract.

5- *Miscellaneous*. In any arbitration proceeding hereunder:

    a.  proceedings shall, unless otherwise agreed by the Parties, be held in a country which is neither the Client's country nor the Consultant's country.

    b.  The English Language shall be the official language for all purposes; and

    c.  the decision of the Sole Arbitrator or of a majority of the arbitrators (or of the third arbitrator if there is no such majority) shall be final and binding and shall be enforceable in any country of competent jurisdiction, and the parties hereby waive any objections to or claims of immunity in respect of such enforcement."

**B.    The Choice-Of-Law Agreement**

47.    According to Article (3) of the General Conditions of Contract;

> *"This Contract, its meaning and interpretation, and the relation between the Parties shall be governed by the Applicable Law."*

48.    Article 1.1 (b) of the General Conditions of Contact defines "Applicable Law" as:

> *"Means the laws and any other instruments having force of the law in the Client's country, or in such other country as may be specified in the Special Conditions of Contract (SCC), as they may be issued and in force from time to time."*

49.    Clause 1.1(a) of the SCC provides that;

> *"The contract shall be construed in accordance with the law of the Islamic Republic of Afghanistan."*

50.    Accordingly, as confirmed in the Terms of Appointment, the Laws of Afghanistan shall apply to the merits of the case.

**C.    The Procedural Rules: The UNCITRAL Arbitration Rules 2013**

51.    According to Articles 39 to 41 of the Terms of Appointment:

-    this arbitration shall be conducted under the Arbitration Rules of the United Nations Commission on International Trade Law ("the UNCITRAL Rules) as in force in 2013.

-    For any procedural issues not dealt with by the UNCITRAL Rules, the Tribunal shall apply the rules that the Parties have agreed upon. In the absence of such agreement, the Tribunal shall apply the rules it deems appropriate.

-    *IBA Rules:* The Tribunal may be guided by the IBA Rules on the Taking of Evidence in International Arbitration (2020), but shall not be bound to apply those rules.

52.    As decided by the Tribunal under Section VI.A(1), since the seat of arbitration is Paris, France, therefore, the provisions of the French Civil Code of Procedure governing international arbitration shall apply as *lex arbitri* for all issues where the UNCITRAL Rules are silent.

**16**

## IV.  HISTORY OF THE ARBITRATION PROCEEDINGS

53.  On 17 September 2021, Claimant filed the Notice of Arbitration (the "NoA") seeking the following:

    a)    order the Respondent to settle in full its outstanding debt in unpaid invoice currently totalling USD 444,807;

    b)    order the Respondent to pay interest on the sum referred to in (a) above;

    c)    order the Respondent to pay interest on unjustified 18-month delayed payment for services provided to it under Amendment No.2;

    d)    order the Respondent to reimburse the Claimant for all legal, representative and other expenses incurred to date in seeking recovery of debt;

    e)    order the Respondent to compensate, in damages, the Claimant for 3.5 months of services provided to it in good faith and in clear understanding that, in return, all three amendments will be honoured and paid in time, which was not the case. The Claimant values this at lowest ceiling totalling USD 286,902 that includes only fees of two experts;

    f)    order damages award to the Claimant in accordance with obligations under Energy Charter Treaty;

    g)    order award of additional damages caused in bad faith by the Respondent; and

    h)    to be held harmless from the financial effects of advancing and prosecuting these proceedings.

54.  According to Claimant,[32] the Notice of Arbitration was served to Respondent by email on 18 and 19 September 2021 as demonstrated by Claimant's email exchange with Mr. Khan Mohammad Takal.

55.  On 22 November 2021, Claimant asked the ICC Court to appoint a sole arbitrator in the arbitral proceedings.

56.  On 23 November 2021, the ICC Secretariat acknowledged receipt of the Application.

57.  On 8 December 2021, the ICC Secretariat informed Respondent that it received the Application from Claimant on 22 November 2021 naming it as Responding Party and requesting the ICC Court to act as appointing authority in accordance with Article 4 of

---

[32] As indicated in ¶ 31 of the Terms of Appointment, the date of the commencement of the proceedings and on which the Notice of Arbitration is considered having been served is an issue that will be decided in the Award.

the Rules of the ICC as Appointing Authority in UNCITRAL or other Arbitration proceedings ("the Appointing Authority" Rules).

58. On 21 December 2021, the Secretariat referred to its correspondence dated 8 December 2021 by which it notified the Application to Responding Party and drew the Parties' attention that it has received delivery failure notifications for the email addresses abrahim.abram@mew.gov.af and kabir.isakhel@aop.gov.af, but has not received any delivery failure notifications for the following email addresses:

abrahim.abram@gmail.com

arifalyasi@hotmail.com

ahmadreshadhakim@gmail.com

waisbasiri@gmail.com

dmirzaee@gmail.com

hfahim200@gmail.com

59. The Secretariat asked Claimant to confirm by 23 December 2021 whether it would like the Secretariat to re-notify the Application to alternative email addresses, and if not, the notification shall be deemed to have been made on the day it would have been received at the last address of the party, pursuant to Articles 3(3) and 3(4) of the Rules (of the Appointing Authority).

60. On 21 December 2021, Claimant sent an email to the Secretariat explaining that Respondent's email accounts with the domain name <gov.af> were encountering technical difficulties, which led the MEW's personnel to use their personal email addresses in their official communication on behalf of Respondent. It submitted that Respondent has been deliberately adopting a "policy of ignorance" in this arbitration, as it has done in two other ongoing arbitrations, and thus, Respondent should be deemed to having been notified at its last known address.

61. On 26 December 2021, Mr. Reshad Hakim wrote to the ICC Secretariat asking to remove him from the recipients list of communication because he was no longer working for Respondent. He added that *"the new authorities of the Ministry of Energy and Water have been updated and briefed about the matter and now you may contact them and other friends copied in email who are still on their positions to solve the matter. I wish to be excluded from further communications."*

62. Claimant thus wrote to the ICC Secretariat on the same day (26 December 2021), submitting that Mr. Hakim's email proved that Respondent has been effectively notified of the Application as some of the email recipients were still working for Respondent.

63. On 3 January 2022, another recipient of the ICC Secretariat's email, Mr. Hamid Fahim, wrote to the ICC seeking his removal from the mail list too because he had not been

officially responsible of the Contract with Claimant, nor was introduced as representative of Respondent. He added that he was not working in the Ministry since 15 August 2021.

64. On the same day, the ICC Secretariat sent a letter to the Parties, acknowledging receipt of:

  - Claimant's correspondence of 21 and 26 December 2021, copies of which were enclosed for Responding Party; and

  - Responding Party's (Mr. Reshad Hakim's) correspondence of 26 December 2021. The ICC Secretariat invited Claimant to indicate by 5 January 2022 whether it wished to keep Mr. Hakim in the correspondence addressed to Responding Party. The Secretariat also asked the Responding Party whether it was represented by Counsel and invited it to provide the relevant contact details.

65. On 4 January 2022, Claimant replied to the ICC Secretariat's letter, submitting that both Messrs. Hakim and Fahim's emails fell short of crucial details and clarity to warrant their exclusion and should thus be kept in the list of recipients on behalf of Respondent. Claimant's email reads as follows:

> *"The Applicant acknowledges receipt of Secretariat's email (below) and letter addressed to parties dated today.*
>
> *The Secretariat has requested the Applicant to provide its comments on or before 5th January 2022 if further correspondence should continue be copied to Mr Hakim given Mr Hakim's request of 26th December 2021 to be excluded from further communication exchange. The Applicant also notes a similar request being made today by Mr Hamid Fahim of the Responding Party.*
>
> *The Applicant finds both emails of Messer Hakim and Fahim to fall short of crucial details and clarity to warrant their exclusion. As a minimum, both individuals were involved in the dispute that evolved between parties and apparently have participated, one way or the other, in discussion of it within the Responding Party. In addition to lack of any details of the officers-in-charge that come as replacement for these individuals, it is also not possible to verify with absolute certainty if these individuals have truly departed the Responding Party and/or when. The Applicant is of the view that unless authorised representative of the Responding Party itself comes forward confirming its credentials and requests such exclusion and/or modification to communication list, all contacts available at this moment for the Responding Party should be maintained without exclusions. Any such exclusion at this stage*

> *could cause prejudice to the Applicant through manipulative*
> *jurisdictional challenge of arbitrator appointment in the future."*

66. On 6 January 2022, the Secretariat acknowledged receipt of:

    - Mr. Hamid Fahim's correspondence of 3 January 2022, a copy of which was sent to Applicant/Claimant and was attached for all concerned; and

    - Applicant/Claimant's correspondence of 4 January 2022, a copy of which was sent to Responding Party.

    The Secretariat noted Mr. Fahim's requests and Applicant/Claimant's request to maintain Mr. Fahim and Mr. Hakim in the list of recipients; it added that it *"will continue sending correspondence to Responding Party to Mr Fahim and Mr Hakim's email addresses. Any questions pertaining to the parties' representation and contact details will be addressed by the arbitral tribunal once constituted."*

67. On 19 January 2022, the Secretariat acknowledged receipt of Dr. Sally El Sawah's Statement of acceptance, availability and impartiality and independence as Sole Arbitrator.

68. On 27 January 2022, the International Court of Arbitration of the International Chamber of Commerce ("the ICC Court"):

    - decided that it was satisfied that an agreement empowering it to act according to the Rules of ICC as Appointing Authority in UNCITRAL or Other Arbitration Proceedings existed (Article 5(3));

    - appointed Dr. Sally El Sawah as sole arbitrator pursuant to Articles 8 of the UNCITRAL Rules (Article 6(1)(a)); and

    - fixed the costs for the services requested at US$ 7 000 (Article 12(5) and 2(a) and 3(1) of the Appendix).

69. On 28 January 2022, the Secretariat informed the Parties of Dr. Sally El Sawah's appointment as Sole Arbitrator and transmitted the arbitration file to the Parties and the Sole Arbitrator.

70. On 30 January 2022, the Sole Arbitrator granted the Parties until Monday 7 February 2022 close of Business ("COB") CET to provide their views on the following:

    1. whether the Parties intended of make requests for production of specific documents;

    2. whether the Parties intended to submit written witness evidence;

    3. the number of rounds of written submissions;

**20**

    4.  the Provisional timetable; and

    5.  any other issues that any of the Parties may wish to raise.

71.  On 30 January 2022, the Sole Arbitrator received a delivery failure notification to the following recipient: <abrahim.abram@mew.gov.af>. On 4 February, it received a similar notification regarding <kabir.isakhel@aop.gov.af>.[33] No such delivery failure notification was received regarding the other recipients included in Respondent's point of contact.

72.  On 1 February 2022, Claimant provided its comments and views on the Sole Arbitrator's questions of 30 January 2022. It stated that it had no intention to submit witness or expert statements, and that only one round of submissions of 4 weeks granted to each party would be sufficient. It emphasised that Mr. Davletkhan was not an employee or "in-house" of Claimant, and requested the inclusion to Respondent's list of recipients of Mr. Saidataullah Seddiqi (contactable at <saidataullah.seddiqi@gmail.com>), Respondent's legal advisor in other arbitral proceedings.

73.  On 7 February 2022,[34] the Sole Arbitrator reminded Respondent that it had until the close of business of the same day to provide its views, as directed by the Sole Arbitrator on 30 January 2022.

74.  On 7 February 2022, Claimant added additional minor comments regarding the time limits for the Parties to file their submissions given the Covid-19 impact on either of the Parties' ability to submit their respective submissions within 4 weeks. As such, the Claimant suggested 6 weeks per Party, instead of the originally proposed 4 weeks, to account for any unforeseen delays.

75.  On 14 February 2022,[35] the Sole Arbitrator submitted to the Parties a Draft Terms of Appointment and Procedural Timetable seeking their views, comments and observations by no later than 21 February 2022. In this email, the Sole Arbitrator instructed the following:

> *"Finally, until the first deposit is made to the Tribunal, any communications by email relating to the Terms of Appointment to which a Party does not respond or acknowledge receipt thereof within 48 hours following their transmission by email, shall be sent in hard*

---

[33] Annex 2 to the Award. The different delivery notifications that were received by the Tribunal may be found under Annex 2 to the Award.

[34] This email could not be delivered to the following recipient<abrahim.abram@mew.gov.af>, as per the delivery failure notification of the same date.

[35] This email could not be delivered to the following recipient <abrahim.abram@mew.gov.af>, as per the delivery failure notification of the same date.

*copy by express courier by the Opposing Party within three business days following such transmission by email."*

76. In the first draft of the Terms of Appointment attached to her email of 14 February, the Sole Arbitrator suggested the following:

> *"According to Article 3(2) of the UNCITRAL Rules, these arbitral proceedings are deemed to have commenced on 16 November 2021, the date on which the Respondent received the Notice of Arbitration."*

77. In its response of 21 February 2022, Claimant suggested a different date and requested from the Sole Arbitrator to *"consider 18 September 2021, when Respondent acknowledged receipt of the Notice, as the date on which arbitral proceedings commenced for the reasons outlined in email."* Claimant explained that it feared that Respondent could use the date of 16 November 2021 abusively to unlawfully challenge the appointment of the Sole Arbitrator by the ICC as follows:

> *"Contact person designated in this Contract (clause 6.1/6.2), Mr Waliullah Jabarkhel, was replaced by Mr Abrahim Abram in 2018, both being Procurement Directors of the Respondent. Mr Abram was named in a separate contract between Parties (2019) as Respondent's designated representative in the same clauses SCC 6.1 and 6.2 (see attached contract extract of 2019, full contract available upon request) as Mr Jabarkhel departed the Respondent in 2018. Since the Claimant had on-going commercial relationship with the Respondent throughout 2019-2020 on a separate contract, last known authorised contacts of the Respondent were used in email communication of the Notice of Arbitration and Respondent's response was immediately received. The only reason the Claimant is concerned with this date is to disallow potential manipulative jurisdictional challenge as the Claimant was entitled to appeal to the ICC for sole arbitrator appointment upon expiration of 30 days from the moment Respondent was notified of Claimant's appointed arbitrator (clause SCC 45.1.1(c)). The Claimant initiated days count from the moment the Respondent confirmed its awareness of the Notice."*

78. In addition, Claimant provided its comments and observations on the draft Terms of Appointment. By a separate email of the same date (21 February 2022), Claimant produced its Power of Attorney authorising Mr. Davletkhan to act as Claimant's legal representative.

79. By letter of 28 February 2022 sent by email[36] and by express courier (under AWB 816152840110) to Respondent's address in Afghanistan, the Sole Arbitrator submitted a second Draft Terms of Appointment addressing Claimant's comments and observations, seeking the Parties' comments and observations by 14 March 2022 at the latest. In the margin of the Second Draft attached to both the Sole Arbitrator's email and letter, the Sole Arbitrator also requested from the Parties to provide their *"comments on Articles 2.1 to 2.5 of the UNCITRAL Rules, including but not limited to the « designated or authorised » e-mail address, and to direct the Sole Arbitrator to any facts that could be of relevance in this respect."*

80. By email of 7 March 2022, FedEx informed the Sole Arbitrator that her letter under AWB 816152840110 *"has been blocked because the service [was] interrupted due to the current war situation."* On 8 March 2022, upon the Sole Arbitrator's inquiry, FedEx explained that it was referring to the war between Russia and Ukraine.[37] Pursuant to this information and upon the Sole Arbitrator's query, other courier service providers and mail post offices confirmed to the Sole Arbitrator the interruption of the services to Afghanistan, including registered mail with request of acknowledgement of receipt.

81. On 8 March 2022, Claimant sought the Sole Arbitrator's views on including the following four email addresses (or selected) on behalf of Respondent in the communication list:

    info@mew.gov.af

    akhtarmohammadnasrat@gmail.com

    chiefofstaff.mew.1443@gmail.com

    h.aminzay@gmail.com

82. By email of 10 March 2022, Claimant confirmed its full agreement with the proposed Terms of Appointment ("Terms") and provided the following comments to ¶ 15 of the Draft Terms of Appointment, as requested by the Sole Arbitrator:

    > *"The Claimant acknowledges receipt of your email dated 28 February 2022 and confirms full agreement with the proposed Terms of Appointment ("Terms"). The Arbitrator also requested Parties to provide further comments to paragraph 15 of the Terms and the Claimant hereby provides its further comments as follows:*
    >
    > *A) Contract Clauses 6.1 and 6.2*

---

[36] This email to Respondent could not be delivered to <kabir.isakhel@aop.gov.af> and <abrahim.abram@mew.gov.af>, as per the delivery failure notification of the same date of 5 March 2022.

[37] Annex 1 to the Award.

*Contract clauses GCC 6.1 and 6.2 are read as:*

> *"6.1. Any communication required or permitted to be given or made pursuant to this Contract shall be in writing in the language specified in Clause GCC 4. Any such notice, request or consent shall be deemed to have been given or made when delivered in person to an authorized representative of the Party to whom the communication is addressed, or when sent to such Party at the address specified in the SCC.*
>
> *6.2 A Party may change its address for notice hereunder by <u>giving the other Party **any communication**</u> of such change to the address specified in the SCC." (emphasis added)*

*Contract clauses SCC 6.1 and 6.2 name Mr Waliullah Jabarkhel as Respondent's Procurement Director and focal point for communications. However, Mr Jabarkhel left the Respondent in April 2018 and was replaced by new Procurement Director – Mr Abrahim Abram. Of particular note is that the Parties signed a different contract on 19 January 2019 (see Attachment 1)[38] in which the Respondent had amended identical clauses SCC 6.1 and 6.2 (see Attachment 1, page 27) to reflect Respondent's organisational changes applicable since 2019 onwards and now reads as:*

> *"Ministry of Energy and Water (MEW)*
>
> *Attention: Muhmmad Abrahim Abram*
>
> *Facsimile: +93 (0) 788082208*
>
> *E-mail (where permitted): Abrahimabram@mew.gov.af"*

*Given the wording of clause GCC 6.2 (i.e. "A Party may change its address for notice hereunder by giving the other Party any communication of such change"), it can be interpreted that new communication provisions (SCC 6.1/62) that now emerge in a 2019 signed contract correspond to Respondent serving "any communication" to the Claimant of such update/change. Indeed, contract signed in 2019 makes it clear that Mr Jabarkhel was no longer Respondent's communication focal point.*

---

[38] Page 5 of this contract is signed by Claimant and the MEW's representative.

*On 14 February 2017, the Claimant filed its first Notice of Arbitration with the Respondent, in both electronic and hard copies, addressed to Mr Jabarkhel (see ICC Application, Exhibit10); however, given that communication details have changed and the Claimant was put on notice since 19 January 2019 of Respondent's new contact details, it relied on this updated contact details.*

*B) Courier Difficulties*

*The Claimant was informed by international couriers, after August 2021, that there are logistical problems in any delivery of post to/from Afghanistan. The same difficulty remains in place today as well, to the best of Claimant's knowledge. Thus, the Claimant attempted to communicate via email using addresses that were last known, including in updated SCC 6.1/6.2, and Respondent's response was received on 18 and 19 September 2021 (see ICC Application, Exhibit 8). With Respondent confirming by email safe receipt of the Notice of Arbitration, the Claimant felt satisfied that notice was factually served and received. Particularly, Respondent's Minister Khan Takal instructed Respondent's incumbent staff to handle the matter: "Dear Wais Basiri, Hakimi [Reshad], Aliyasi [Arif] and Abram [Abrahim] please be in contact with [Claimant] and raise the issues with new leadership of the [Afghan] Government" (see ICC Application, Exhibit 8, page 1). The Claimant had all the reasons to initiate the 30-day count, prior to approaching the ICC, on 18 September 2021. The hard copy of the Notice was dispatched later as a courtesy but with an understanding that it may not be delivered anyway; whilst email was safely delivered on time.*

*C) Established Communication Practice*

*Contract enclosed in Attachment 1 to this email contains certain provisions in clauses SCC 6.1 and 6.2. The Parties have two other on-going parallel arbitral proceedings since 2019 and 2020, accordingly. Notice of Dispute for the latter was sent by email to Mr Khan Takal, Respondent's Minister, on 7 July 2020 (see Attachment 2). Presumably upon instructions of Mr Takal, a subordinate responded to the Notice of Dispute on behalf of the Respondent on 15 July 2020 (see Attachment 3) Notice of Arbitration was filed on 14 September 2020 only to Mr Takal and only by email (see Attachment 4) – a communication process that differs from provisions of contract clauses 6.1/6.2. Since the Respondent ignored the Notice, the Claimant approached the PCA (the appointing authority) upon expiration of 30 days from the day it communicated the Notice to Mr Takal, requesting the PCA to appoint sole arbitrator. The PCA appointed sole arbitrator on 15 December*

25

> *2020 (see Attachment 5). On 14 January 2021, the Claimant and the PCA were approached by Respondent's counsel informing of their appointment to represent the Respondent (see Attachment 6) in those arbitral proceedings.*
>
> ***As it can be seen from above, there was an established communication practice between Parties exchanging arbitral and other notices by email only, with Mr Takal acting as focal point, and such practice did not face any objection or criticism from the Respondent. On contrary, the Respondent accepted such communication methods.[39]***
>
> *It should also be noted that the Notice of Arbitration under these proceedings was communicated on 18 September 2021 to Mr Abrahim Abram as well (along with other officials of the Respondent), who de facto and de jure replaced Mr Jabarkhel as Respondent's focal point in contract clauses SCC 6.1 and 6.2 as is evidenced from new contract signed between Parties on 19th January 2019 (Attachment 1).*
>
> *Taking into account all of the above, individually or collectively, the Claimant believes that it met the requirements of UNCITRAL Rules' articles 2.1 to 2.5 in communicating Notice of Arbitration to the Respondent on 18 September 2021 by email."*

83. On 11 March 2022, the Sole Arbitrator acknowledged receipt of Claimant's clarifications regarding the Terms of Appointment and reminded Respondent that it had until to provide its comments on Claimant's clarifications by 14 March 2022 at the latest.[40]

84. On 15 March 2022, the Sole Arbitrator has sent the final version of the Terms of Appointment and Procedural Timetable to the Parties by email for signature. The Sole Arbitrator also tried to send the final version to Respondent by facsimile.[41] After several attempts, the Sole Arbitrator received facsimile reports indicating that the facsimiles she has tried to send have been rejected with the following message: *"Pas de périphérique Fax (13073) [Négo.]"*, which may be translated to "No fax device". A careful review of the Exhibits[42] shows that the fax number provided in the Contract is the same number as

---

[39] (Emphasis added).

[40] This email to Respondent could not be delivered to <abrahim.abram@mew.gov.af> and <kabir.isakhel@aop.gov.af (kabir.isakhel@aop.gov.af)>, as per the delivery failure notifications of the same date of 11 March 2022.

[41] The Sole Arbitrator notified the Parties of her attempts to send a facsimile to Respondent by an email of the same date to the Parties, 15 March 2022. this email to Respondent could not be delivered to <abrahim.abram@mew.gov.af> and < kabir.isakhel@aop.gov.af (kabir.isakhel@aop.gov.af)> as per the delivery failure notifications of 15 March 2022.

[42] Exhibit 7 to the Application.

Mr. Ibrahim Abram's cellular phone number, which could perhaps explain why the facsimile could not get through on 15 March 2022.

85.    On 15 March 2022, Claimant submitted a signed version of the Terms of Appointment and Procedural Timetable.

86.    On 6 April 2022,[43] the Sole Arbitrator acknowledged receipt of Claimant's share (EUR 10,000) in the initial deposit (of EUR 20,000) in accordance with ¶ 53 of the Terms of Appointment, and noted that Respondent has still not made the payment of its share although the 15 days granted to the Parties to make such payment has lapsed. Claimant has thus made the payment of Respondent's share in accordance with the Terms of Appointment, and as instructed by the Sole Arbitrator in her email of 6 April 2022.

87.    By email of 20 April 2022,[44] the Sole Arbitrator explained that given the difficulties faced to deliver previous communication to Respondent by facsimile, post, and international courier, she has sent the following documents to the Embassy of the I.R. of Afghanistan in Paris, the place of the seat of arbitration suggested by Claimant. She added that the documents were received by the Embassy which affixed its stamp on the courier's delivery note. The Sole Arbitrator requested from his excellency the Ambassador to transmit the following documents to the Ministry of Energy and Water of Afghanistan (Darulaman Road, Kabul, Afghanistan):

-    Copy of the Sole Arbitrator's letter to the Ministry of Energy and Water of 28 February 2022;

-    Copy of the email exchange between the Tribunal and the Parties between 28 January and 15 March 2022;

-    Copy of the final version of the Terms of Appointment and Procedural Calendar of 15 March 2022 signed by the Sole Arbitrator;

-    Copy of the final version of the Terms of Appointment and Procedural Calendar of 15 March 2022 with track-changes showing the different comments and amendments included in the previous drafts of the Terms of Appointment.

88.    The Sole Arbitrator also instructed Claimant to dispatch the hard copy of its submissions and accompanying material to Respondent in accordance with ¶¶ 5 and 64 of the Terms of Appointment, to the attention of Respondent at the address of the Embassy of the I.R. of Afghanistan in France, should Claimant still encounter courier difficulties to deliver

---

[43]    this email to Respondent could not be delivered to <abrahim.abram@mew.gov.af> and <kabir.isakhel@aop.gov.af (kabir.isakhel@aop.gov.af)> as per the delivery failure notifications of 6 April 2022.

[44]    this email to Respondent could not be delivered to <abrahim.abram@mew.gov.af> and <kabir.isakhel@aop.gov.af (kabir.isakhel@aop.gov.af)>, as per the delivery failure notifications of 20 April 2022.

them to Respondent's address in Afghanistan. Claimant acknowledged receipt of the instructions on the same date and confirmed its agreement to act accordingly.

89. On 27 April 2022, Claimant sought a 10-day extension for the submission of the Statement of Claim "SOC", which was granted by the Sole Arbitrator by an email of the same date.[45] The new date to submit the Statement of Claim became 6 May 2022, and Respondent was granted an additional period of 10 days to its initial 6 week-time limit for the submission of the Statement of Defence ("SOD"). The new date to file the Statement of Defence thus became 27 June 2022.

90. On 8 May 2022, Claimant filed its Statement of Claim via email, with the accompanying factual and legal exhibits.

91. On 8 May 2022, Claimant also asked the Sole Arbitrator whether it include the following four email addresses (or selected) in the list of recipients on behalf of Respondent:

info@mew.gov.af

akhtarmohammadnasrat@gmail.com

chiefofstaff.mew.1443@gmail.com

h.aminzay@gmail.com

92. By email of 11 May 2022,[46] the Sole Arbitrator acknowledged receipt of Claimant's Statement of Claim "SOC" and accompanying Exhibits and Legal authorities and authorised Claimant to add Respondent's catch-all email account <info@mew.gov.af> to the mailing list, deeming unnecessary to expand the communication to the other suggested recipients. The Sole Arbitrator also directed Claimant to send the Sole Arbitrator a copy of the courier note to the Embassy of Afghanistan in Paris for the record. Given that Claimant filed its SOC on 8 May instead of the 6th, Respondent was granted by the Sole Arbitrator an equal amount of extension to file its Statement of Defence which henceforth became due on 1st of July 2022.

93. By email of 11 May 2022, Claimant enclosed a courier waybill and the confirmation of delivery to the Embassy of Afghanistan of its Statement of Claim and accompanying factual and legal exhibits. Claimant further confirmed that it has added info@mew.gov.af account to the Respondent's list of recipients.

---

[45] this email to Respondent could not be delivered to <abrahim.abram@mew.gov.af> and <kabir.isakhel@aop.gov.af (kabir.isakhel@aop.gov.af)>, as per the delivery failure notifications of 27 April 2022.

[46] This email to Respondent could not be delivered to <abrahim.abram@mew.gov.af> and <kabir.isakhel@aop.gov.af (kabir.isakhel@aop.gov.af)> as per the delivery failure notifications of 11 May 2022. The Sole arbitrator also received another email from <POSTMATER@moph.gov.af> with the following notification "The message you sent to mew.gov.af/info was rejected because it would exceed the quota for the mailbox."

94. By email of 9 June 2022, Claimant submitted that prior to filing its Statement of Claim, it acquired two notary public certifications of Contract's Amendment No.3 (Exhibit C-07), with scan attached, as C-07 contains certain changes to clauses of the Main Contract and represents the last of the signed amendments. For avoidance of doubt, Claimant added that it was open to courier the originally certified C-07 to the Tribunal and Respondent and sought Arbitrator's instructions in this regard.

95. On 10 June 2022,[47] the Sole Arbitrator granted Respondent until 13 June 2022 to provide its comments on Claimant's email of 9 June 2022.

96. On 14 June 2022,[48] the Sole Arbitrator sent an email to the Parties noting that Respondent has not provided its comments on Claimant's email of 9 June as directed by the Sole Arbitrator in her email of 10 June 2022. The Sole Arbitrator invited Claimant to send the originally certified Exhibit C-07 to the Sole Arbitrator and Respondent by courier to its Embassy in Paris should the courier services to Afghanistan remain unavailable. Claimant was also directed to provide the Sole Arbitrator with a copy of the delivery note of the courier to Respondent.

97. On 16 June 2022, Claimant mentioned that the courier services to Afghanistan were still unavailable, and thus, the parcel was arranged to the address of Respondent's Embassy in Paris.

98. On 17 June 2022, Claimant confirmed to the Sole Arbitrator that Exhibit C-07 was successfully delivered to Respondent as evidenced by the DHL Waybill, the delivery confirmation and proof of delivery.

99. By an email of the same date (17 June),[49] the Sole Arbitrator acknowledged receipt of Claimant's email and attachment, and the DHL parcel including a Notary Public's certification of Exhibit C-07 (Amendment no. 3). She also invited Respondent to comment on this document in its Statement of Defence, should it deem it necessary.

---

[47] This email to Respondent could not be delivered to <abrahim.abram@mew.gov.af> and <kabir.isakhel@aop.gov.af (kabir.isakhel@aop.gov.af)> as per the delivery failure notifications of 10 June 2022. On 10 June, the Sole Arbitrator also received a delivery failure notification from <mu.aman@mcit.gov.af" with the following message: "The message you sent to mew.gov.af/info was rejected because it would exceed the quota for the mailbox."

[48] This email to Respondent could not be delivered to <abrahim.abram@mew.gov.af> and <kabir.isakhel@aop.gov.af (kabir.isakhel@aop.gov.af)> as per the delivery failure notifications of 14 June 2022. The Sole arbitrator also received another email from <POSTMATER@moph.gov.af> with the following notification "The message you sent to mew.gov.af/info was rejected because it would exceed the quota for the mailbox."

[49] This email could not be delivered to <abrahim.abram@mew.gov.af> and <kabir.isakhel@aop.gov.af (kabir.isakhel@aop.gov.af)> as per the delivery failure notifications of 17 June 2022. The Sole arbitrator also received another email from <mu.aman@mcit.gov.af> with the following notification "The message you sent to mew.gov.af/info was rejected because it would exceed the quota for the mailbox."

100. By email of 5 July 2022, Claimant pointed out that Respondent has not submitted its Statement of Defence on the due date (1 July 2022) and mentioned that Respondent has adopted the same conduct in the two other pending proceedings. It thus requested that the Sole Arbitrator applies Article 30 of the UNCITRAL Rules (as previously pointed out by the Sole Arbitrator to Respondent in her email of 28 February 2022) and to continue the arbitral proceedings notwithstanding Respondent's deliberate non-submission of its Statement of Defence. Claimant mentioned that an Oral Hearing and subsequent steps envisaged under phases 6 to 8 of the Procedural Timetable may not be necessary as Claimant would be the only participant to the hearing. It thus proposed to move to submission of costs (phase 9) unless the Sole Arbitrator had any questions to the Parties.

101. By email of 5 July 2022,[50] the Sole Arbitrator confirmed that Respondent has not filed its Statement of Defence on 1 July 2022, in accordance with the Procedural Calendar attached to the Terms of Appointment of 15 March 2022 and acknowledged receipt of Claimant's email of the same date. The Sole Arbitrator invited Respondent to provide its comments on Claimant's email and propositions by no later than 8 July 2022. The Sole Arbitrator pointed that should Respondent fail to provide its comments on the allocated date, the Sole Arbitrator will move to phase 4 of the Procedural Calendar and will put her Questions to the Parties by 22 July 2022. She also provided the procedural timeframe for the steps that should follow the Questions by the Sole Arbitrator as follows:

    i.    the Parties' Answers to the Tribunal's Questions within two (2) weeks from the date of the Tribunal's questions; and

    ii.    the Parties' Submissions on costs within one (1) week from the date of the Parties' Answers to the Tribunal's Questions. The cost submissions need only include the cost data necessary for the Tribunal to calculate an award of costs, if any.

102. In addition, the Sole Arbitrator drew Respondent's attention again to Article 30 (2) of the UNCITRAL Rules and that the arbitration shall continue notwithstanding its failure to communicate its Statement of Defence or participate in the proceedings. Moreover, the Sole Arbitrator pointed out that the second deposit of EUR 10,000 fell due on 8 July 2022 in accordance with ¶54 of the Terms of Appointment and should either of the Parties fail to pay its share, the other Party should pay the remaining part, without prejudice to the Sole Arbitrator's final decision on the allocation of the costs of arbitration (¶55 of the Terms of appointment). She concluded by mentioning that a copy of her email will be

---

[50] This email to Respondent could not be delivered to <abrahim.abram@mew.gov.af> and <kabir.isakhel@aop.gov.af (kabir.isakhel@aop.gov.af)> as per the delivery failure notifications of 16 July 2022. On 16 July 2022, the Sole Arbitrator also received a delivery failure notification from <mu.aman@mcit.gov.af" with the following message: "The message you sent to mew.gov.af/info was rejected because it would exceed the quota for the mailbox."

sent by courier to Respondent's Embassy in Paris and attached a copy of that letter to her email.

103. As announced by the Sole Arbitrator, a registered letter with acknowledgement of receipt[51] was sent to Respondent's Embassy in Paris seeking the transmission of the attached communication to Respondent's address in Afghanistan. The letter referred to the Sole Arbitrator's previous letter of 20 April 2022 (which included a copy of the Sole Arbitrator's communication with the Parties from 28 February to 15 March 2022) and enclosed the new communication from 27 April to 5 July 2022.

104. On 5 July 2022, Claimant acknowledged receipt of the Sole Arbitrator's email of the same date and confirmed that the deposit will be settled on or before 8 July 2022, as instructed.

105. By email of 16 July 2022,[52] the Sole Arbitrator sent to the Parties her questions and announced that a letter of the same date will be sent to Respondent's Embassy in Paris by registered mail with return receipt. A hard copy of the email and attached questions was thus sent to Respondent's Embassy in Paris on 25 July 2022 by registered mail with acknowledgment of receipt. Respondent received the hard copy on 27 July as per the return receipt.[53] Claimant acknowledged receipt of the Sole Arbitrator's email on 16 July 2022.

106. By email of 19 July 2022,[54] the Sole Arbitrator pointed out that no new evidence or exhibits could be submitted with the Parties' Answers to the Tribunal's Questions. Claimant acknowledged receipt of the Sole Arbitrator's instructions by email of 20 July 2022.

107. On 2 August 2022, Claimant submitted its answers to Sole Arbitrator's questions, and mentioned that il will also send them via courier to Respondent's Embassy in Paris as instructed by the Tribunal earlier.

108. By email of the same date (2 August 2022), the Sole Arbitrator acknowledged receipt of Claimant's Answers to the Tribunal's Questions and noted that Respondent has not

---

[51] The letter was received by the Embassy on 6 July 2022 as confirmed by the acknowledgement of receipt notification, Annex 1 to the Award. The Sole Arbitrator has sent the registered letter with acknowledgement of receipt after the Embassy's refusal to receive the letter delivered by hand through courier, See, the courier's delivery failure notification of 6 July 2022, Annex 1 to the Award.

[52] This email to Respondent could not be delivered to <abrahim.abram@mew.gov.af> and <kabir.isakhel@aop.gov.af (kabir.isakhel@aop.gov.af)> as per the delivery failure notifications of 16 July 2022. On 5 July 2022, the Sole Arbitrator also received a delivery failure notification from <mu.aman@mcit.gov.af" with the following message: "The message you sent to mew.gov.af/info was rejected because it would exceed the quota for the mailbox."

[53] Annex 1 to the Award.

[54] This email to Respondent could not be delivered to <abrahim.abram@mew.gov.af> and <kabir.isakhel@aop.gov.af (kabir.isakhel@aop.gov.af)> as per the delivery failure notifications of 19 July 2022.

provided its Answers as instructed. The Sole Arbitrator granted Respondent one week to comment on the Answers provided by Claimant and added that after the expiry of that allotted time limit, the Parties should then provide their Submissions on Costs within one week from the date of the Parties' Comments on the Answers of the other Party. The Sole Arbitrator reminded her previous instructions that the cost submissions needed only include the cost data necessary for the Tribunal to calculate an award of costs, if any.

109. On 16 August 2022, Claimant submitted its Submissions on Costs, seeking an order from the Tribunal that Respondent should pay;

    a) USD 264,600.00 as Legal representation costs; and

    b) USD 40,837.00, as arbitration costs.

110. By email of 17 August 2022, the Sole Arbitrator acknowledged receipt of Claimant's Submission on Costs and pointed out that Respondent has not filed any submissions or communication since the beginning of the proceedings.

111. By email of 7 September 2022, the Sole Arbitrator informed the Parties that due to an unforeseen impediment, the award could not be expected before early October, and Claimant acknowledged receipt thereof by an email of the same date.

112. By email of 10 September 2022, Claimant informed the Sole Arbitrator that it became in possession of new indisputable evidence confirming Respondent's full awareness of the arbitral proceedings and its deliberate decision to ignore them. It mentioned that according to its Duty to Assist set out in ¶ 70 of the Terms of Appointment and Articles 2 and 27 of the UNCTIRAL Rules, it was compelled to inform the Sole Arbitrator of the *"emergence of such evidence for the Tribunal to decide on its relevance."* It pointed out that it could understand that the Sole Arbitrator could be reluctant to accept the production of any new evidence at this late stage of the proceedings.

113. On 11 September 2022, the Sole Arbitrator acknowledged receipt of Claimant's email and granted Respondent until 13 September 2002 (COB) to provide its comments thereon.

114. By email of 14 September 2022, the Sole Arbitrator authorised Claimant to produce the evidence it was mentioning in its 10 September 2022, which may be read as follows:

> *"With reference to Claimant's email of 10 September 2022 and the Sole Arbitrator's email of 11 September 2022;*
>
> *Whereas Respondent has not provided its comments to Claimant's email as invited by the Sole Arbitrator within the time granted;*
>
> *With reference to articles 2, 17, 27 and 30 of the UNCITRAL rules;*

*With reference to the duty of the Arbitrator and the parties to ensure the efficiency of the proceedings, due process and the effectiveness of the award;*

*Without prejudice to the arbitrator's discretionary power to appreciate the facts of the case and determine the relevance, materiality and weight of the evidence offered,*

*Therefore, the Sole arbitrator grants leave to the Claimant to produce the evidence in its possession that would establish 'Respondent's full awareness of these arbitral proceedings and its decision to willingly ignore it'"*.

115. On 14 September 2022, Claimant informed the Sole Arbitrator that it has uploaded the factual Exhibits (C-55 to C-59) to "Box" due to the heavy size of the files and mentioned that an automated link to the "Box" was shared by email with Respondent's list of recipients in this arbitration. Yet, no link was shared with the Sole Arbitrator.

116. By email of 15 September 2022, the Sole Arbitrator instructed Claimant to share the link to these exhibits and to send a copy of these exhibits by rapid courier to Respondent at the address of its Embassy in Paris and provide the Sole Arbitrator with the final status of delivery as per the rapid courier's records.

117. By email of 15 September 2022, Claimant provided the Sole Arbitrator with the requested link and undertook to comply with the Sole Arbitrator's instructions regarding Respondent's notification by courier.

118. On 19 September 2022, Claimant provided the proof of delivery by courier to Respondent's Embassy in Paris.

119. By email of 4 October 2022, the Sole Arbitrator informed the Parties that the proceedings shall be closed on 24 October 2022 and thus granted them until 23 October to provide any comments or objections they may have on the conduct of the proceedings. The Sole Arbitrator attached a copy of the letter she intended to send by courier to Respondent's Embassy in Paris.[55] Finally, the Sole Arbitrator informed the Parties that she had to remove the email addresses abrahim.abram@mew.gov.af and info@mew.gov.af from the mailing list because they were preventing her email from being sent as evidenced by the screenshot attached to her email.

120. On 4 October 2022, Claimant confirmed that it had no comments on the conduct of the proceedings and inquired on whether the 24 October 2022 was a tentative date for rendering the award. It pointed out that it has re-included the addresses of abrahim.abram@mew.gov.af and info@mew.gov.af in its reply email to ensure that these

---

[55] The letter which was sent on 5 October 2022 was received by the Embassy on 8 October 2022 as evidenced by the return receipt, See Annex 1 to the Award.

two persons were formally recipients of the Sole Arbitrator's email which was below Claimant's response.

121. In her reply email of 7 October 2022, the Sole Arbitrator mentioned that the Award should be expected within a few days from the cut-off date of 24 October. The Sole Arbitrator pointed out that she had to remove the email addresses abrahim.abram@mew.gov.af and info@mew.gov.af from the mailing list again because they were preventing her email from being sent.

122. By an email of the same date, 7 October 2022, Claimant acknowledged receipt of the Sole Arbitrator's email and re-included the addresses of abrahim.abram@mew.gov.af and info@mew.gov.af to the list of recipients to ensure that these two persons were formally recipients of the Sole Arbitrator's email which was below Claimant's response.

123. On 24 October 2022, the Sole Arbitrator pointed out that she has not received any objections from either Party on the conduct of the proceedings within the time limit granted and declared the proceedings closed as of that date in accordance with Article 31 of the UNCITRAL Rules. The Sole Arbitrator emphasised that a copy of her email will be sent to the Respondent's Embassy in Paris by registered mail and attached a copy of that letter to her email. The email addresses abrahim.abram@mew.gov.af and info@mew.gov.af were added to the list of recipients and the Sole Arbitrator did not encounter the same technical obstacle which prevented her two previous emails from being sent to the Parties.

124. On 24 October 2022, the proceedings in this matter have been closed (the cut-off date).[56]

125. On 23 November 2022, the Sole Arbitrator informed the Parties that the Award was finalised and ready for dispatch and sought payment of the remainder of the Sole Arbitrator's fees and expenses (EUR 11,471). Payment of the entire amount was made on the same date by Claimant covering both its share and that of Respondent.[57]

## V.    SUMMARY OF FACTS AND ISSUES

126. Claimant introduced its claims, seeking payment of several invoices by Respondent. According to Claimant, Respondent was in breach of its contractual obligations and the applicable laws. *Inter alia,* Respondent:

[56] Therefore, as indicated by the Sole Arbitrator in her second email to the Parties of 22 November 2022, the Tribunal did not take into consideration Claimant's emails of 22 November 2022 at 3:25 pm and 5:08 pm Paris time. The Sole Arbitrator has previously sent a first email to the Parties on 22 November 2022 asking them to share the name and mobile phone number of the person to whom the award should be sent as this information was required from the courier services. Only Claimant replied to this email.

[57] This email to Respondent could not be delivered to <abrahim.abram@mew.gov.af> and <kabir.isakhel@aop.gov.af (kabir.isakhel@aop.gov.af)> as per the delivery failure notifications of 23 November 2022.

34

     i.    acted in bad faith towards Claimant, contrary to its obligations under Clause 43 of the Contract (the GCC);

    ii.    failed without just cause to settle in full and on time the Claimant's submitted invoices for services performed, contrary to its obligation under Article 41 of the Contract (the GCC);

    iii.    violated the Energy Charter Treaty obligations to which both Afghanistan and the United Kingdom are signatories;

    iv.    deliberately caused avoidable financial loss and damage to Claimant in retaliation for Claimant's refusal to pay bribes;

    v.    violated numerous agreements reached between the Parties throughout 2014 and 2015; and

    vi.    ignored Claimant's numerous attempts to settle this dispute amicably including a complete ignorance of earlier communicated Notice of Dispute on 1 November 2016, followed by Notice of Arbitration on 30 March 2017 and numerous reminders to all high-ranking officials of the MEW.[58]

127. Claimant contended that pursuant to its refusal to pay bribes and then reporting the fact of extortion to the then-Minister and Chief of Staff at the Respondent's Ministry, it faced an unprecedented, unjustified, and wholly inappropriate scheme of harassment by Respondent with the intention to cause Claimant maximum financial damage.[59]

128. According to Claimant, as Mr. Hashimi from Procurement started pushing with bribery again, on 24 January 2014, Claimant reported the extortion attempts to the MEW's Chief of Staff at that time, Mr. Amin Lashkari, enclosed to its email the bribe solicitations and audio records of extortion and described in detail the surrounding events.[60]

129. Subsequently, Claimant was called by the then Respondent's Deputy Minister, Mr. Qazizadah, to discuss the matter and the full audio recording was handed over to him. Mr. Qazizadah assured Claimant that harassment would not occur again and that he will handle the matter with the Procurement Director personally. Pursuant to this meeting with Mr. Qazizadah, previous orders on payments suspension and Contract value reduction were abandoned.[61]

---

[58] SOC ¶ 5.

[59] SOC ¶ 4.

[60] SOC ¶ 23.

[61] SOC ¶ 25.

130. Claimant submitted that it was Respondent who constantly advocated for Claimant's continued presence and services.[62] For instance, in response to Claimant's complaints of continued non-payments and delays to the conclusion of the necessary amendments to extend the Contract term timeously,[63] Mr. Qazizadah addressed various Afghan officials, the WBG and Claimant, formulating Respondent's need in Claimant's services. In one of his emails dated 23 June 2014, Mr Qazizadah mentioned that:

> "*I cannot afford of not having them with our t[ea]m in LSC and as well as in the JWG.*"[64]

131. Yet, by February 2015, Claimant was not paid for some of its invoices under the Main Contract (invoices dated March 2014), not paid for any of its invoices under Amendment no.1 and had no Amendment no.3 on hands with Amendment no.2 expiring on 24 February 2015. Claimant thus informed Respondent that the liabilities and delays on Respondent's part were outrageous and Claimant will not continue working after the expiration of Amendment no.2 unless there was a signed Amendment no.3 and a pathway on payments. This resulted in urgent steps taken by Respondent on the last day of Amendment no.2 that led to the immediate enforcement of Amendment no.3 by Respondent. According to Claimant, the importance of Amendment no.3 for Afghanistan was hard to underestimate given the Project's official schedules distributed amongst all participating countries and financing partners for tasks to be completed by each country, including Afghanistan, by July 2015.[65]

132. Claimant contended that, in March 2014, while the Main Contract was still on-going, Respondent requested Claimant to provide it a one-month no-charge services before Respondent can complete the internal paperwork for the Amendment no.1 to commence in May 2014. Claimant was requested, and agreed, to continued full time services during this "transition" period. However, Claimant agreed to this on one condition –the invoices be paid immediately and without delays–, in exchange for no-charge services. Respondent agreed. This constituted an agreement between the Parties. However, only Claimant kept its part of the agreement as its invoices were not paid for more than a year.[66]

133. According to Claimant the payment delays continued. On 18 May 2014, Claimant reminded Mr. Qazizadah of the condition upon which the Parties agreed to no-charge

---

[62] SOC ¶ 27.

[63] Exhibit C-26.

[64] Exhibit C-26, Respondent's email of 23 June 2014.

[65] SOC ¶ 32.

[66] SOC ¶ 35.

services in the first place. Mr. Qazizadah replied the next day, on 19 May 2014 assuring that *"[p]ayment and amendment is a done deal and you should not worry."*[67]

134. Claimant explained that upon various assurances of Respondent of immediate payments release, Respondent again asked for a two-months additional services at no charge between Amendments no.1 and no.2, i.e., from 25 August to 23 October 2014. As Respondent continued delays notwithstanding Claimant's uninterrupted services, Claimant notified Respondent on 26 September 2014 that it will henceforth charge for the services provided in these two "transition" periods if the delays continued: *"[w]e will be compelled to invoice for these "gap" days since April 2014 if these delays continue. No-charge was conditional on timely payments, which is not occurring on the part of the Government."*

135. As the default of payments continued until 2015, Claimant notified Respondent on 23 February 2015 that it has provided Respondent with services without charge in April-May and then again in August-October 2014. Three full months of services were thus provided and the amount that Claimant would have charged in this respect exceeded USD 300,000 net of taxes.[68] Yet, notwithstanding Respondent's assurance that Claimant should not worry about its rights and should continue its services,[69] delays continued nevertheless.[70]

136. In addition to the issue of delays and default of payment, according to Claimant, the Main Contract was part of a wider agreement between the Parties that Claimant would eventually receive a total amount of USD 3,000,000. It was Respondent who has informed Claimant of the World Bank Grant Financing Agreement that allocated USD 3,000,000, towards its Contract.[71] Thus, Claimant had a legitimate expectation and the Parties agreed –without any doubt –to receive a total of USD 3,000,000 under the Grant Financing Agreement.[72]

137. According to Claimant, it became clear in late 2013 that the Contract was more complex and required more resources and time than originally anticipated. Thus, in order not to derail the objectives and funds available to the Grant No. TF093513-AF, the World Bank and Afghanistan signed a new grant agreement –Grant No. Q901 –that was devoted exclusively to Claimant's Contract with an estimated cost of USD 3,000,000.[73] The payment mechanism under the Grant Agreement was as follows: the World Bank transferred advance funds to a designated account owned by the Afghan Ministry of

---

[67] Exhibit C-35 (email exchange between Claimant and Respondent, 18-19 May 2014).

[68] SOC ¶ 38.

[69] SOC ¶ 39.

[70] SOC ¶ 37.

[71] SOC ¶ 42.

[72] SOC ¶ 43.

[73] Claimant's Response to Tribunal's Questions to the Parties, p. 7.

Finance and dedicated specifically to Claimant's Contract. Then, the executing ministry (i.e., the Ministry of Energy and Water) requested the Ministry of Finance to process payments from this Government account to Claimant based on invoices it received from Claimant.[74]

138. However, notwithstanding Respondent's assurances, Amendment No.4 was never signed as Mr Qazizadah fell ill and did not attend the ministry since the second half of 2015, and the 'newcomers' did not honour Respondent's agreements previously made. Moreover, Respondent applied hostage-taking tactics against Claimant by effectively turning the Claimant into a "commercial slave" since all of the invoices starting from Amendment no.2 (and No.3) were pending with the MEW and were partially released only on 26 August 2016, (for Amendment no.2 only), i.e., after a meeting held in June 2016. Amendment no.3 invoice was never paid at all. Claimant found itself in a situation where should it not perform after expiration of Amendment no.3, then it will never be paid for both Amendment nos. 2 and 3.[75] Although the Completion date of Amendment No.3 was 25 June 2015, however, Claimant continued assistance without being paid up to 30 June 2016, a year later. No services were provided after 30 June 2016.[76]

139. Claimant affirmed that the World Bank agreed to eventually release USD 3 million to Respondent and effectively transferred USD 2,640,896 towards the Contract with Claimant with a right to an additional amount of USD 359,104 upon request. It added that the last page of the Supreme Audit Report of the Ministry of Finance's activities under the Grant Agreement for the year ending 21 December 2015 clearly shows that the Government had a right to obtain the entire USD 3,000,000 from the World Bank into the Government's project account towards Claimant's Contract.[77] Yet, in furtherance of its pre-planned to dishonour its debt and avoid payments to Claimant in bad faith, Respondent did not request the replenishment by the World Bank[78] of the remaining USD 359,104.[79]

140. Claimant's contention is that the non-extension of the Main Contract and delays of payment were measures of retaliation by the Procurement Directorate for Claimant's refusal to pay bribes.[80]

---

[74] Claimant's Response to Tribunal's Questions to the Parties, p. 4. This payment scheme is corroborated by Exhibits C-26, C-27 and C-28.

[75] SOC ¶47.

[76] Claimant's Response to Tribunal's Questions to the Parties, p. 4. See however, ¶¶ 26, 36 and 38 of the Notice of Arbitration.

[77] Claimant's Response to Tribunal's Questions to the Parties, p. 5.

[78] Exhibit C-3 explicitly mentions the possible applications for replenishment by Respondent (Article III (iii)).

[79] Claimant's Response to Tribunal's Questions to the Parties, p. 6.

[80] SOC ¶48.

## VI.   THE TRIBUNAL'S DECISION

141.   Prior to ruling on the merits of the case (C), the Tribunal shall decide on the procedural matters relating to the seat of arbitration and the date of commencement of the proceedings (A) as well as on its jurisdiction to rule on Claimant's claims against the Government of Afghanistan and not only the Ministry of Energy and Water (B). The Tribunal's decision shall follow a brief description of Claimant's arguments on each of these issues.

### A.   Procedural Matters

#### 1.   The Seat of Arbitration

142.   In Section VII of the Terms of Appointment, the Sole Arbitrator has suggested to the Parties to postpone the decision on the seat of arbitration until the final award. Claimant had no objection to this suggestion and Respondent has not participated in the proceedings until today. The rationale behind this proposal was to grant the Parties further time to reflect and perhaps reach an agreement on this issue should Respondent decide to appear in the proceedings.

143.   Accordingly, and given that Respondent has not participated in the proceedings and, thus, no agreement could be reached between the Parties, the Sole Arbitrator is now addressing the issue of the place/seat of arbitration.

144.   According to Article 45.1.5(a) of the SCC, the arbitral proceedings shall be held in *"a country which is neither the Client's country [i.e. Afghanistan] nor the Consultant's country [i.e. the United Kingdom]"*.[81]

145.   In its Application,[82] Claimant suggested the place of arbitration to be in Paris, which is the place of incorporation of the ICC, the Appointing Authority chosen by the Parties.

146.   The Sole Arbitrator considers that Paris is the seat that meets most the Parties' intention for the following reasons. It results from Article 45.1.5(a) of the SCC that the Parties have wished to have a "neutral" forum as a place of arbitration. In addition, the Parties have designated the ICC in Paris as appointing authority, contrary to the two pending arbitrations under a different contract where the Parties have designated the PCA (the Permanent Court of Arbitration). Paris is also the place where the Sole Arbitrator has her main place of business and is domiciled. Finally, Paris is one of the main arbitration hubs worldwide and has a well-established case law and arbitration rules ensuring the efficiency of arbitration proceedings and the effectiveness of arbitral awards.

---

[81] Exhibit C-1, SCC, Article 45.1.5(a). See also Application, ¶ 2.7.1.

[82] Application, ¶ 2.7.2.

147. For the foregoing reasons, the Sole Arbitrator decides that Paris, France, is the place of arbitration.

    **2.** ***On the Date of Commencement of the Arbitration, Article 2 of the UNCITRAL Rules and the Parties' Agreement on the Communication by Email***

148. According to Article 3(2) of the UNCITRAL Rules, the *"arbitral proceedings shall be deemed to commence on the date on which the notice of arbitration is received by the Respondent."*

149. Article 2 of the UNCITRAL Rules, which governs the "Notice and Calculation of periods of time", provides that:

> *"1. A notice, including a notification, communication or proposal, may be transmitted by any means of communication that provides or allows for a record of its transmission.*
>
> *2. If an address has been designated by a party specifically for this purpose or authorized by the arbitral tribunal, any notice shall be delivered to that party at that address, and if so delivered shall be deemed to have been received. Delivery by electronic means such as facsimile or e-mail may only be made to an address so designated or authorized.*
>
> *3. In the absence of such designation or authorization, a notice is:*
>
> > *(a)   Received if it is physically delivered to the addressee; or*
> >
> > *(b)   Deemed to have been received if it is delivered at the place of business, habitual residence or mailing address of the addressee.*
>
> *4. If, after reasonable efforts, delivery cannot be effected in accordance with paragraphs 2 or 3, a notice is deemed to have been received if it is sent to the addressee's last-known place of business, habitual residence or mailing address by registered letter or any other means that provides a record of delivery or of attempted delivery.*
>
> *5. A notice shall be deemed to have been received on the day it is delivered in accordance with paragraphs 2, 3 or 4, or attempted to be delivered in accordance with paragraph 4. A notice transmitted by electronic means is deemed to have been received on the day it is sent, except that a notice of arbitration so transmitted is only deemed to have been received on the day when it reaches the addressee's electronic address.*

**40**

*6. For the purpose of calculating a period of time under these Rules, such period shall begin to run on the day following the day when a notice is received. If the last day of such period is an official holiday or a non-business day at the residence or place of business of the addressee, the period is extended until the first business day which follows. Official holidays or non-business days occurring during the running of the period of time are included in calculating the period."*

### a.    Claimant's Position

150. According to Claimant, the date of commencement of the arbitration ought to be the date on which Respondent has been notified of the Notice of Arbitration by email, i.e., 18 September 2021, and not via courier services.

151. Claimant submitted that[83] the Parties have agreed in the Contract to designate the Procurement Director, Mr. Jabarkhel, as the point of contact to receive communication on behalf of Respondent. Pursuant to Mr. Jabarkhel's departure from the MEW in April 2018 and his replacement by Mr. Abrahim Abram as Procurement Director, Mr. Abram has become Respondent's new point of contact. The fact that Mr. Abram became the new point of contact under the Contract was also confirmed by the Parties' practice after the conclusion of the Contract. Indeed, on 19 January 2019,[84] Claimant and Respondent (the MEW) concluded another contract whereby Respondent has designated Mr. Abram as point of contact to receive on its behalf the communication from Claimant. Claimant added that due to technical difficulties with the domain "gov.af", Mr. Abram was also using his personal email address (abrahim.abram@mew.gov.af; abrahim.abram@gmail.com).

152. Claimant stated that the Notice of Arbitration was duly sent to Mr. Abram via email. Indeed, Mr. Abram was copied of Mr. Takal's email of 18 September 2021 via both his personal and professional email accounts.[85] Mr. Takal was the MEW's Deputy Minister who occupied this position at the MEW from 12 October 2018 to 9 January 2020 and then became the MEW Minister until 7 September 2021.

153. Claimant added that the communication in this arbitration ought to be also addressed to Messrs. Alyasi, Hakim and Basiri at the email addresses designated by Mr. Takal.

---

[83] Application of 22 November 2021, ¶2.1.2, pp. 3-4, Exhibits C-3 to C-8 of the Application. See also Claimant's reply of 21 February 22 to the Tribunal's questions on ¶15 of the Draft Terms of Appointment.

[84] Whereas Claimant has produced only an excerpt of this document under its Exhibit C-6 to its Application, it has produced the entire Contract as Attachment no. 1 to its email of 11 March 2022. The Contract was signed by both Parties (see page 6 of the Contract).

[85] Exhibit 8 to the Application.

Mr. Takal has in fact directed Claimant to address its communications to these persons, and to Mr. Abram, when he acknowledged receipt of the Notice of Arbitration.[86]

154. Regarding Mr Dawood Mirzaee (dmirzaee@gmail.com); Mr Hamidullah Fahim (hfahim200@gmail.com); Mr Kabir Isakhel (kabir.isakhel@aop.gov.af), Claimant mentioned that it was Respondent who designated these persons in two on-going arbitration proceedings that it introduced against Respondent and requested them to be added to the communication in these proceedings.

155. Finally, upon Claimant's request and leave from the Tribunal, Respondent's generic email <info@mew.gov.af> was added to the list of recipients.

  **b.    The Tribunal's Decision**

156. In order to determine the date of commencement of the arbitral proceedings, it is important to decide on whether or not the Parties have consented on a designated person to receive notices and whether such notices could be served by email.

157. Firstly, regarding the question of the "designated person", it results from a combined reading of Articles 6.1., 6.2. and 9.1. of the SCC of the Contract under dispute, on the one hand, and Articles 6.1. and 6.2. of the SCC of the Contract between Claimant and Respondent of 19 January 2019, on the other hand, that the Procurement Director was the Respondent's "authorised representative" under the Contract. This person was Mr. Jabrakhel, who was then replaced in his functions by Mr. Abram. As mentioned previously, Mr. Abram was copied of Mr. Takal's email of 18 September 2021 acknowledging receipt of the Notice of Arbitration.

158. Secondly, with respect to the Parties' agreement that notices to the designated persons be made by email, it results from the contemporaneous documents that the Parties have clearly and consistently communicated with each other via email. In fact, Claimant's complaints about the lack or delays of payments or about the delays in the conclusion of Amendments to the Contact, as well as Respondent's various replies, were done via emails from and to Respondent's personnel's personal accounts.[87]

159. Communication via email, including for notices, was the Parties' practice since the beginning of their relationship. For instance, Claimant's expression of interest was submitted to Respondent via email to the Hotmail account of Mr. Saeed Hashimi, the MEW/MoF/CTAO Procurement MIS Specialist. Mr. Hashimi confirmed in his email that *"Yes we can accept email submissions for the EoI"*.[88] Mr. Hashimi's electronic signature included both his addresses at Hotmail and the MEW's domain <mew.gov.af>. Mr. Hashimi then sent to Claimant the invitation letter and the request for proposal via

---

[86] Exhibit 8 to the Application.

[87] See for instance, Exhibits C-26 to C-28 and C-34.

[88] Exhibit C-12.

his Hotmail account, and afterwards the signed Contract and the Minutes negotiations too.[89] Mr. Abram was also communicating with Claimant via his Gmail account.[90]

160. In addition to the Parties' practice during the conclusion (and performance) of the Contract, the Parties have also accepted that the notices concerning the arbitral proceedings may be made via email. In fact, in their arbitration clause (Article 45.1 of the SCC), the Parties have chosen the ICC Secretariat as Appointing Authority.

161. Whereas it is public information that the ICC generally transmits correspondence by email, Article 3(3) of the ICC "Appointing Authority" Rules also provides for the possible delivery of notifications by email as follows:

> "All notifications or communications from the Secretariat shall be made to the last address of the party or its representative for whom the same are intended, as notified either by the party in question or by the other party. Such notification or communication may be made by delivery against receipt, registered post, courier, email, or any other means of telecommunication that provides a record of the sending thereof."

162. Moreover, Article 5(1)[91] of the "Appointing Authority" Rules provides that by designating the ICC as appointing authority, the Parties agree to abide by these rules, i.e., Article 3(3), *inter alia*.

163. The Parties have thus made an informed decision that the communication with the Appointing Authority, including the appointment of the sole arbitrator, be made by email. In fact, in its letter to Respondent of 8 December 2021, the ICC Secretariat has expressly emphasised that *"Responding Party is invited to provide its email address/es as the Secretariat generally transmits correspondence by email."*

164. It results from the above that the Parties have agreed that notices with respect to the arbitral procedure (including, the Notice of Arbitration or the Application to the Appointing Authority) be made by email and accepted it as a valid means of communication.

165. This is comprehensible given the restrictions on courier services to Afghanistan which make any delivery via mail services to Respondent's address in Afghanistan almost impossible.

---

[89] Exhibits C-16 and C-17.

[90] See Exhibit C-7 to the Application, Mr. Abram's email of 21 January 2019 (abrahim.abram@gmail.com).

[91] Article 5(1) reads as follows: *"When the parties have agreed that ICC shall act as appointing authority, they shall be deemed to have submitted to the Rules, unless they have expressly agreed to submit to the version thereof in force on the date of their agreement."*

166. Added to this initial impossibility of delivery to Respondent via mail services, notices and communication <u>by email only</u> became inevitable in the aftermath of the Covid-19 pandemic outbreak. This was the case for Claimant's Notice of Arbitration and for its Application for the appointment of a Sole Arbitrator by the ICC. Given the Covid's (further) complications to the (already challenging) delivery to Respondent, in its acknowledgement of receipt of Claimant's Application, the ICC Secretariat has emphasised that communication with the Secretariat is done by email only due to Covid's ensuing constraints.[92]

167. Therefore, the Tribunal considers that the Notice of Arbitration is deemed to have been received by Mr. Abram on the date he was copied of Mr. Takal's email on 18 September 2021 in accordance with Articles 2 and 3(2) of the UNCITRAL Rules.

168. The fact that Respondent has received the correspondence from and with the ICC as well as of the present arbitration may be corroborated by an email of 26 December 2021 from one of the recipients in the contact lists designated by Claimant (pursuant to Mr. Takal's instructions) as points of contacts on behalf of Respondent to whom the ICC Secretariat has notified the Application and Notice of Arbitration. In this email, Mr. Reshad Hakim stated the following:

> "[...] For your information, as i am not on my previous job anymore and i was just asked by Mr Takkal to make some coordinations, i did my best but i will not be able to contribute to this case closeout further, **the new authorities of the Ministry of Energy and Water have been updated and briefed about the matter and now you may contact them and other friends copied in email who are still on their positions to solve the matter.** I wish to be excluded from further communications.*
>
> *Good Luck*
>
> *Reshad Hakim*
>
> *Economist*"[93]

---

[92] ICC Secretariat's letter of 23 November 2021. It reads as follows:

*"Further to paragraph 11 of the ICC Guidance Note on Possible Measures Aimed at Mitigating the Effects of the COVID-19 Pandemic (full note available here), requests for arbitration (including pertinent exhibits) and other initiating documents should be filed with the Secretariat by email."*

[93] Emphasis added.

In a follow-up email, Claimant wrote the following to the ICC: "*In continuation of your email below dated 21st December 2021 and my subsequent response to it dated the same day, the Secretariat and the Applicant received crucial email today from the Responding Party that is enclosed with this email. Responding Party's Mr Reshad Hakim's public LinkedIn profile is enclosed highlighting that he is/was Responding Party's Director General for Admin and Finance and he also confirms in his email acting at instructions of the former Deputy Minister, Mr Takal.*

44

169. A similar email was sent by another recipient, Mr. Hamid Fahim, on 3 January 2022 who submitted that he was not working for Respondent since 15 August 2021.

170. It is thus reasonable to infer that Respondent has been duly notified by Claimant on 18 September 2021 of the present proceedings as well as of Claimant's Application for the appointment of a Sole Arbitrator by the ICC.

171. After the constitution of the Tribunal on 27 January 2022 and the transfer of the file to the Sole Arbitrator by the ICC Secretariat on 28 January 2022, the Sole Arbitrator communicated with the Parties at first by email only. From the contact list of persons and addresses of Respondent provided by Claimant, the Sole Arbitrator has received delivery failure notifications for the email addresses <abrahim.abram@mew.gov.af> and <kabir.isakhel@aop.gov.af> only.[94] No failure delivery notifications were received regarding the other recipients, including Mr. Abram's personal email account.

172. Nonetheless, given that Respondent has not responded to the emails sent by the Sole Arbitrator inviting the Parties to comment on the Terms of Appointment, the Sole Arbitrator has also sent the draft Terms of Appointment by courier starting from 3 March 2022. The first courier was sent to Respondent's mail post address in Afghanistan on 3 March 2022 including the Sole Arbitrator's letter of 28 February 2021 inviting the Parties to provide their comments on the Terms of Appointment and

---

*Materially, the following two crucial facts were provided today by Mr Hakim in relation to the arbitral proceedings, Application and the Responding Party, reproduced here as direct quotes from Mr Hakim's email:*

*1) "authorities of the Ministry of Energy and Water have been updated and briefed about the matter"*

*2) "other [staff] copied in email who are still on their positions to solve the matter."*

*This undeniably proves that the Responding Party has been made fully aware of the development and communications, and lack of its response to the Secretariat is its deliberate choice of action.*

*The Applicant kindly requests the Secretariat, if it is possible at all of course, to establish the official record that the Responding Party (1) has been aware on record of the arbitral proceedings and communications related to the Application; and (2) at least some of the emails provided for the Responding Party indeed belong to current officials representing the Responding Party as it has been confirmed today.*

*The Applicant believes that this information and record is crucial for avoidance of doubt in the future and avoid any abuse of process."*

[94] Annex 2 to the Award. The same issue was encountered by the ICC Secretariat. See the ICC Secretariat's email to Claimant of 21 December 2021. According to Claimant, the domain <gov.af> was encountering technical difficulties, which was the reason why MEW's officials were using their personal addresses in official communications, See Claimant's answer to the ICC's email of 21 December 2021 and Exhibit 7 to the Application.

Starting from 11 May 2022, the Sole Arbitrator received a delivery failure notification to the following address <mew.gov.af/info> "because it would exceed the quota for the mailbox".

Claimant's comments thereon of 21 February 2022. FedEx then informed the Tribunal that all services to Afghanistan were suspended because of the war.[95]

173. After many failed attempts to send the communication by facsimile at the number indicated in the contract of 19 January 2019, the Sole Arbitrator started to send the communication to Respondent by email and to the address of the Embassy of Afghanistan in France.[96] In the beginning, the Embassy accepted receipt by hand from the courier service but refused afterwards. After the Embassy's refusal to receive by hand the correspondence from the courier on 5 July 2022, the Sole Arbitrator kept sending communication to Respondent at its Embassy's address in France by registered letter with acknowledgement of receipt starting from 6 July 2022.[97]

174. The Sole Arbitrator also instructed Claimant to send its Submissions and exhibits to Respondent by courier at the address of Respondent's Embassy in Paris so long as the courier services were not possible to Respondent's address in Afghanistan.

175. On 4 October 2022, the Sole Arbitrator has granted the Parties until 23 October to raise any comments or objections they may have to the conduct of the proceedings, after which the proceedings will be declared closed as from 24 October 2022. A copy of this email was sent to the address of Respondent's Embassy in Paris.[98] On 4 October 2022, Claimant confirmed that it did not have any comments. Respondent has not provided an answer.

176. It is noteworthy that on 4 and 7 October 2021, the Sole Arbitrator was not able to send any emails to the Parties unless the emails of Mr. Abrahim Abram's professional account <abrahim.abram@mew.gov.af> and Respondent's generic address <info@mew.gov.af> were removed. The Sole arbitrator had thus to remove their addresses from the mailing list. However, such obstacle was temporary, and the Sole Arbitrator was able to include these two recipients in her email to the Parties of 24 October 2022.[99]

---

[95] Annex 1 to the Award. In addition, regarding Exhibit 2 (FedEx shipment tracking number) to Claimant's Application, upon the Sole Arbitrator's enquiry, Claimant confirmed to the Sole Arbitrator that FedEx was not able to deliver the Notice of Arbitration sent by courier on 10 November 2021 to Respondent. On 10 March 2022, Claimant informed the Sole Arbitrator that it filed its first Notice of Arbitration with Respondent, in both electronic and hard copies, addressed to Mr. Jabarkhel, and it was informed by international couriers, that there were logistical problems in any delivery of post to/from Afghanistan since August 2021.

[96] Annex 1 to the Award

[97] Annex 1 to the Award.

[98] Annex 1 to the Award.

[99] It occurs from the IT reports of the Sole Arbitrator's server that the Sole arbitrator's address has been blocked by these two recipients. The occurrence of this incident at a time where the issuance of the award was expected could constitute a further indication that Respondent was fully aware of the proceedings and that it has deliberately decided not to participate in the arbitration.

It is noteworthy that the Sole Arbitrator did not encounter any obstacle to send to these two accounts or any other recipients her email of 22 November 2022 asking the Parties to share a mobile phone number and the

177. For all the foregoing reasons, the Sole Arbitrator decides that the date of notification of the Notice of Arbitration to Respondent was 18 September 2021. The Sole Arbitrator is satisfied that all reasonable measures have been taken to ensure that Respondent was duly notified of the different steps of the proceedings and that it was afforded an ample opportunity to present its case in accordance with due process and the rights of defense. It is noteworthy that, in pursuance of its duty to ensure and strike a balance between the efficiency of the proceedings and the effectiveness of the award, the Tribunal has applied reasonably extended periods between the different submissions and the award in case Respondent, a sovereign State, would change its position and decide to participate in the proceedings and engage in an adversarial discussion.

178. The above reasons are in the Tribunal's eyes sufficient to reach the conclusion that Respondent was duly notified of the Notice of Arbitration on 18 September 2021 and was fully aware of the present proceedings, without the need to refer or rely on the additional documents produced by Claimant on 14 September 2022 upon the Tribunal's leave. These additional documents did not bear any evidentiary weight in the Tribunal's reasoning and decision.

## B.    Jurisdiction

### 1.    The Claimant's position

179. According to Claimant,[100] although the Ministry of Energy and Water enjoys legal personality under the Laws of Afghanistan, it is nonetheless a simple administrative unit of the Afghan Government according to the Afghan Constitution. Therefore, *"the Contract with the Ministry was not signed by an entity separate from the State, but by an organ of the State, whose acts are undoubtedly performed on behalf and in the interests of the State."* In addition, the Republic of Afghanistan was the recipient of the WBG's grant under the Grant Financing Agreement signed by the Ministry of Finance on behalf of the Afghan State. The fact that the Grant Agreement referred to the Ministry of Energy and Water *"or any successor thereto"* shows that *"it was immaterial if a body* [here the MEW] *would be changed at any point in time, binding the State regardless."* Accordingly, the Republic of Afghanistan is a Party to the Contract and to these arbitral proceedings.

### 2.    The Tribunal's Decision

180. The issue is to determine whether the MEW was acting on behalf of the State of Afghanistan notwithstanding its separate legal personality, either under the representation or agency doctrine, or as per the concept of "instrumentality", such that

---

name of the persons who will receive the award as this information was required by the courier services. A delivery failure notification was received from the account <abrahim.abram@mew.gov.af> on the same date.

[100] SOC ¶¶ 6-11.

the latter is a Party to the Contract concluded by the former and thus to the Arbitration Agreement contained therein.

181.  The concept of State "instrumentality" has been adopted by many arbitral awards to refer to an entity enjoying a separate legal personality, created by the State for a specific purpose, which is controlled by the State itself. This was the case for instance in the ICC Award 9762/1991 produced by Claimant under Exhibit CLA-1.

182.  In its Judgment in the *Pakistan vs. Dallah* case,[101] the Paris Court of Appeal dismissed an action to set aside the award of an arbitral tribunal which extended the arbitration agreement to the Government of Pakistan in a contract signed by a Trust which enjoyed legal personality for the following reasons:

> « L'État qui a créé un trust ayant la personnalité morale pour s'occuper d'un projet et qui, parallèlement et après la disparition de ce trust, continue de s'impliquer dans l'exécution du contrat et se comporte comme si le contrat litigieux était le sien, sans qu'il soit fait état d'actes accomplis par le trust, partie signataire, et qui, lors des négociations précontractuelles s'était déjà comporté ainsi, confirme que la création du trust était purement formelle, et qu'il était la véritable partie à l'opération économique. En conséquence, est infondé le moyen pris de ce que le tribunal arbitral a étendu à tort la clause d'arbitrage à cet État et s'est déclaré compétent ».

This may be translated as follows:

> "The State which has created a Trust enjoying a legal personality to deal with a project and which, in parallel and after the disappearance of this Trust, continues to be involved in the performance of the contract and behaves as if the disputed contract was its own, without reference to any actions performed by the Trust, the signatory party, and which, during the pre-contractual negotiations had already behaved in the same manner, confirms that the creation of the Trust was purely a formality, and that it was the real party to the economic operation. Consequently, the plea that the arbitral tribunal wrongly extended the arbitration clause to this State and upheld its jurisdiction is unfounded."

183.  Although the underlying facts in the *Pakistan/Dallah* case and the present matter could be slightly different, in the sense that in *Dallah*, a Trust was involved, whereas in the present case, it is a Ministry which is involved, in both cases, the rationale is in fact the

---

[101] Paris, 17 February 2011, *The Ministry of Religious Affairs, Government of Pakistan vs/ Dallah Estae and Tourism Holding Company, JCP G* 2011, 1432, no 2, obs. Ch. Seraglini; *JDI* 2011, p. 395, note I. Michou; *Cah. arb.* 2011, p. 433, note G. Cuniberti; *LPA* 2011, no. 225-226, p. 5, note L.-C. Delanoy; *Rev. arb.* 2012, p. 369, note F.-X. Train.

same. In *Dallah*, the Trust was created for the sole purpose of handling the State's interests under the Contract. This is undoubtedly the case for State ministries, such as the MEW. According to the Afghan Constitution itself (Article 77), the Ministry of Energy and Water is a mere "administrative unit" *(sic)* acting on behalf of the State.

184. Finally, in *Compania and Compagnie Generale v Argentina Republic*, although an Argentinian Province was the only signatory of the underlying agreement and not the State, the arbitral tribunal upheld its jurisdiction and held the Republic of Argentina liable for the actions undertaken by the Province notwithstanding the fact that the latter enjoyed a separate legal personality. The Tribunal ruled that:[102]

> *"Under international law, and for purposes of jurisdiction of this Tribunal, it is well established that actions of a political subdivision of federal state, such as the Province of Tucumán in the federal state of the Argentine Republic, are attributable to the central government. It is equally clear that the internal constitutional structure of a country cannot alter these obligations.* Finally, the Special Rapporteur of the International Law Commission, in discussing the proposed Commentary that confirms the attribution of conduct of political subdivisions to the federal State, has referred to the "established principle" that a federal state "cannot rely on the federal or decentralized character of its constitution to limit the scope of its international responsibilities."

185. If this is the case for political subdivisions of federal states, the same reasoning must apply *a fortiori* for ministries since they form part of the central government.

186. Applying the above principles to the facts of the present case, the Tribunal finds that the MEW is a mere instrumentality and was acting as a representative of the State of Afghanistan for the following reasons:

- according to Article 71 of the Afghan Constitution, the "Government shall be comprised of ministries". Therefore, even if the ministries enjoy a legal personality, this does not deny the fact that they are part of the Government. The Ministries thus act on behalf of the State, such that it may be legitimately inferred that the Ministry of Energy and Water was acting as the representative of the Afghan Government.

- According to Article 108 of the Afghan Constitution, the "administration" of the Afghan Republic is *"based on the units of the Central government and local*

---

[102] *Compania and Compagnie Generale v Argentina Republic* ICSID ARB/97/3 (2000), ¶49, Emphasis added.

*offices",[103]* which according to Article 77 are presided by the *"Ministers"*, the *"Heads of* [these] *administrative units."* This obviously includes the MEW.

- it results from the Afghan Constitution that the National Assembly has a supervisory role over the Ministries (Art. 91, 92, 98 and seq., 103 for example).

- the cover page of the Contract which contains the names of the Parties to the Agreement, the date, the Project and the Grant number refer to the *"Islamic Republic of Afghanistan Ministry of Energy and Water Procurement Directorate".*

- the Afghan State was the recipient of the funds under the Grant Financing Agreement, which amount represented the consideration for Claimant to conclude the Contract under dispute and its Amendments with Respondent.[104]

- It is clearly stated in the *"Form of Contract"* that the *"MEW has received [or has applied for] a grant from the Afghanistan Reconstruction Trust Fund: toward the cost of the services and intends to apply a portion of the proceeds of this grant to eligible payments under this Contract".* In other words, the funds used by the MEW to pay Claimant under the Contract and its Amendments were not from the Ministry's own assets, but those of the State under the Grant Agreement.

- In the "Definitions" under the GCC, it is clearly mentioned that:

    - *(d) "Borrower" means the Government, Government agency or other entity that signs the financing agreement with the Bank.*

    - *(e) "client" means **the implementing agency** that signs the contract for the Services with the Selected Consultant."* The MEW was thus acting as a mere "agency" *(sic)* of the Government of Afghanistan.

- the evidence on record establishes that payment to Claimant was subject to validations by not only the MEW but also the Ministry of Finance,[105] such that the Afghan State, through its different ministries, was involved in the performance of the Contract with Claimant.

187. The foregoing demonstrates without a shadow of doubt that the Ministry of Energy of Water was a mere organ of the State, a simple instrumentality. Accordingly, the Afghan State is a Party to the Contract and its Amendments which were concluded by the Ministry of Energy and Water with Claimant. The State is bound by the arbitration agreement contained therein (Article 45 of the GCC and 45.1 of the SCC) and is thus a party to this arbitration.

---

[103] Emphasis added.

[104] Exhibits C-

[105] Exhibits C-26, p. 6-7, and p. 3 and 4; C-27.

188. Finally, since it is a mere administrative unit of the State enjoying legal personality, the Ministry of Energy and Water, the signatory of the Contract, is a party to the Contract and its Amendments and is also bound by the arbitration agreement contained therein.

189. For the foregoing reasons, the Tribunal declares that it has jurisdiction to rule on the claims brought by Claimant against the Republic of Afghanistan and the Ministry of Energy and Water.

## C.    The Merits

190. The Tribunal shall address Claimant's claims for the amounts of: the unpaid invoices under Amendment no.3 (1), Amendment no. 4 and the no-charge services (2), additional compensations from Respondent's harmful actions, extortion and long-term harassment (3), as well as interest on the claimed amounts (4).

### 1.   On Claimant's Claim for Unpaid Invoices

#### a.    The Claimant's Position

191. Claimant submitted that Respondent has failed to pay the entire invoices due under Amendment no. 3. Therefore, the Tribunal should declare that Respondent is liable to pay Claimant the amount of USD 444,807, inclusive of the total taxes. Indeed, although the Parties have agreed under the Contract that Respondent would deduct the amount of Claimant's due taxes for the sole purpose of avoiding double taxation in the United Kingdom and Afghanistan and enable Claimant to benefit from the unilateral tax relief in the United Kingdom, such arrangement should no longer apply pursuant to Respondent's default of payment, which prevents Claimant from seeking the Unilateral Tax Relief from the United Kingdom.[106]

#### b.    The Tribunal's Decision

192. It results from Amendment no.3, the Grant Financing Agreement and the contemporaneous documents that Claimant has provided Respondent with the services agreed under Amendment no.3. There is no evidence on record that Respondent would have complained that Claimant has not provided these services. The email exchange between the Parties between 3 and 10 March 2015 establish that Claimant has indeed provided the services under Amendment no.3.[107] There is no evidence on the record either that Respondent has paid Claimant for these services under Amendment no. 3 which were invoiced to Respondent under Invoice CK16, quite the contrary.

193. In fact, it results from the Notice of Dispute of 1st November 2016, the Notice of Arbitration of 14 February 2017 and the Notice of Arbitration no. 2 of

---

[106] SOC ¶ 70.

[107] Exhibit C-38. See also Exhibit C-42.

17 September 2021[108] that Respondent has failed to pay Claimant the amounts due under Amendment no. 3.

194. As mentioned above, Respondent was notified of these notices.[109] Yet, in the abovementioned emails acknowledging receipt of Claimant's Notice of Arbitration and requesting to be excluded from the recipients list, neither Messrs Takal, Fahim or Hakim, or any of the other recipients copied have submitted that payment of Claimant's debt has been made. This corroborates the Tribunal's conclusion from the evidence on record that Respondent has failed to pay Claimant the amount of its invoice under Amendment no.3.

195. It results from Article 43 of the Contract and Articles 591 and 592 of the Commercial Code that a contractor may seek compensation for the non-performance by the other party of his obligations under the contract.

196. Accordingly, Claimant is entitled to the payment by Respondent of USD 444,807 corresponding to the total value of the invoice no. CK16 under Amendment no. 3.[110]

197. With respect to the issue of taxes, it is noteworthy that the tax liability fell upon Claimant under the Contract. It was expressly provided under Section 10.0 of the Minutes of the Contract negotiations that:[111]

> *"10.0 Clarification of the consultant's tax liability*
>
> *Consultant is liable for all taxes and duties incurred, it was also agreed that the taxes shown in the original financial proposal will be revised and more accurately calculated in the revised financial proposal."*

198. In other words, payment to Claimant was inclusive of the taxes and duties it would incur. The amounts invoiced by Claimant under the Contract were also inclusive of the total taxes.[112]

199. This conclusion is further confirmed by Articles 39.1 and 39.2 of the Main Contract as amended by Amendment no. 3[113] which provide that *"the Client shall reimburse the Consultant, the Sub-consultants and the experts any taxes, duties, fees, levities and other*

---

[108] Exhibits 9 to 11 to Claimant' Application.

[109] Exhibit 8 to the Application.

[110] Exhibit C-52.

[111] Exhibit C-22.

[112] Exhibits C-49 to C-52.

[113] Exhibit C-07. The same wording may be found in the two other Amendments. Amendment no. 1 which refers to the applicable taxes under the Contract expressly provides that *"these taxes will be charged in consultant's invoices"* (Art. 38.1). It is also expressly mentioned that *"the client shall reimburse the Consultant, the Sub-consultants and the experts any indirect taxes, duties, fees, levities and other impositions imposed under applicable law in the client's country in the Consultant, Sub-consultants and the experts."* (Art. 39.1 and 39.2), Exhibit C-05. *Adde,* Amendment no. 2, Exhibit C-06.

*impositions imposed under applicable law in the client's country on the Consultant, Sub-consultants and the experts."*

200. Furthermore, according to the well-established principle of full compensation *(restitutio in integrum)*, *"reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed."*[114] Claimant should thus be restored to the position it would have enjoyed but for the breaches found by the Tribunal.

201. Therefore, the Tribunal considers that there is no room for the deduction of the taxes applicable to Claimant had Respondent paid the invoices' amounts to Claimant.

202. Finally, the characterization of the nature of the compensation ordered by the award which is subject to the applicable law(s) (Afghan and/or English Tax Law) may be different from that concerning payment of invoices under the Contract.

203. As observed by specialized authors, *"the treatment of taxation by tribunals in setting awards can make an important difference to the net proceeds of an award to a claimant and, therefore, whether the principle of full compensation has been met. Put simply, if an award itself is subject to tax and the value of the award has been calculated by reference to profits lost on a post-tax basis, under compensation of a claimant is likely to arise. In these circumstances, the principle of full compensation might imply, at its most straightforward, that it would be necessary for the claim to include a gross-up for tax payable on the award."*[115]

204. The same authors also observed that, *"in cross-border cases, therefore, it is necessary to consider whether there is symmetry of taxation between the lost profits on one hand, hypothetically subject to tax in the home jurisdiction of the injured company, and the award on the other hand, potentially taxable as income or capital gains when received by the injured company or an affiliate in another jurisdiction. This situation also raises the question, in relation to commercial cases, of equity between jurisdictions, as well as between claimant and defendant; when tax is lost in one jurisdiction as a result of an injury inflicted on one company and paid in another jurisdiction as a result of compensation paid to a parent or affiliate in that other jurisdiction, some form of settlement might be expected between tax authorities in different jurisdictions. However, there is no mechanism in the established tax treaty system for tax fortuitously received in one jurisdiction to be reimbursed to another, so this type of process is not yet formally possible, in commercial cases at least. There is also the possibility of a claimant receiving an award calculated on a pre-tax basis, which is then not subject to tax; for example, if*

---

[114] Permanent Court of International Justice, 13 December 1928, *Case concerning the factory of Chorzow (Germany vs. Poland)*.

[115] James Nicholson and Toni Dyson, Taxation and Currency Issues in Damages Awards, FTI Consulting 01 February 2021, https://globalarbitrationreview.com/guide/the-guide-damages-in-international-arbitration/4th-edition/article/taxation-and-currency-issues-in-damages-awards#footnote-016-backlink.

*circumstances change or an alternative tax return position is taken. Such over-recovery would also be a violation of the principle of full compensation."*

205.  Under these circumstances, besides the Parties' agreement that payment to Claimant is inclusive of taxes, tax outcomes are uncertain and beyond the control of the Tribunal. Reducing the amount of the compensation due to Claimant based on different hypothetical scenarios which have not yet occurred would contradict the principle of full compensation and should thus be avoided. For the same reasons, the Tribunal will not deduct the amount of taxes from the payments awarded to Claimant under Amendment no. 4.

206.  For the foregoing reasons, the Tribunal decides that Claimant is entitled to the payment by Respondent of USD 444,807 corresponding to the total amount of its unpaid invoice under Amendment no. 3 (Relief sought, ¶ 86 (b)).

### 2.  On Claimant's Claim for the amounts of Amendment No. 4 & the No-Charge Services

207.  Regarding Claimant's claim for payment of the amount that it would have collected had Amendment No. 4 been signed, the Tribunal finds that this claim is substantiated for the following reasons.

208.  It is expressly mentioned in the Contract under dispute that it was a "lump sum" contract. Whereas under the contract concluded between the Parties under Grant No. TF0A5630,[116] the Parties agreed to a "Time-Based" Contract, this is not the case for the Contract under dispute. The Minutes of the Contract negotiations, which form an integral part of the Contract,[117] confirm that the Parties agreed to a 100% lump sum contract and not a lump-sum/time-based mix.[118]

209.  In addition, it is expressly mentioned in the Minutes of the Contract negotiations that:

> **"5.1 Contract Extension**
>
> *If the Assignment is not completed in the six months period, the contract shall be extended subject to the client's approval on the basis of current rates stipulated in the revised financial proposal that makes part of this contract."*

---

[116] Attachment no. 1 to Claimant's email of 11 March 2022.

[117] According to Section 13.0. in fine of the Minutes, *"These minutes are part of the negotiated contract and becomes binding upon signing of the agreement."* They were enclosed to Mr. Hashimi's email to Claimant of 27 October 2013 together with the Contract, Exhibit C-17.

[118] Exhibit C-22, Section 5.0. "Deliverables & Mode of Payment".

210. Moreover, it was expressly mentioned in the Minutes that:[119]

> *"It was agreed by the MEW and Consultant that lump sum amounts shall be paid on deliverables after submission of invoices and subsequent approval of by the MEW Project Manager.*
>
> *The UNICON Proposal was prepared in a way to cover most (or all) of the potential needs of the project. They understand that, during project implementation, some changes in activities might be needed and this will be coordinated with the Client. However, their proposed activities shall cover the project in all terms.*
>
> *It was agreed that the taxes shown in the original financial proposal will be revised in conjunction with our Accounting and Finance Directorate and more accurately calculated in the revised financial proposal that will become part of the contract."*

211. Furthermore, Amendments nos. 1, 2 and 3 expressly mentioned that the Contract was a *"lump sum" (sic)* contract and will be subject to extension *"in response to still evolving requirements of the CASA-1000 Project."*[120]

212. The fact that the Contract was a lump sum contract was confirmed by the Parties in their communication during the performance of the Contract. In its email of 23 June 2014 to Respondent, Claimant stated that:

> *"Regarding breakdown of invoices - please note that this is lumpsum contract and lumpsum payments which do not have breakdown, since all costs were put into one basket and then % payments made from this total basket. Therefore, we cannot provide breakdown because it does not exist. However, to separate Unicon net payments from taxes, a percentage can be taken to split the two – Unicon's net payments excluding taxes make up 79.2920277% of the total contract, that is if you divide Unicon's net price on grand total price that includes taxes ($954,140 by $1,203,324). Please see attached financial part of the contract and table below with the split."*[121]

213. In its reply, Respondent has not objected to Claimant's statement and did not continue the discussion about the breakdown and expenditures details for each invoices which it

---

[119] Emphasis added.

[120] Articles 14.1, 38.1 and 41, Exhibits C-5, C-6, and C-7.

[121] Exhibit C-28, p. 4, Emphasis added.

had previously requested,[122] which further corroborates the Parties' agreement that the Contract was a lump sum contract.

214. Besides, it results from the Parties' email exchange during the performance of the Contract that the World Bank had to approve the payment of the *"full amount of Contract"* and Respondent has obtained such approval to cover the invoices which *"were not adjustable with current fund [i.e. the one granted before Amendment no. 1]."* Respondent's statement in this respect reads as follows:

> *"World Bank have approved the 1 Million Dollars for CASA 1000 for this current year. After the Amendment of Tax component, **we will request the World bank for more fund to pay you full amount of Contract. and more invoices were not adjustable with current fund.**"*[123] (Emphasis added)

215. It transpires from the Parties' communication that the Grant from the World Bank, [124] including the funds allocated for Claimant's Contract, were deposited at the Central Bank of Afghanistan in an account dedicated to the Project.[125] It also transpires that already in June 2014, Claimant, Respondent and the World Bank[126] were in agreement that more than one extension to the Contract was necessary (the Parties were referring to "extensions", "amendments" and *"more contracts" (sic)*.[127] To Claimant's question on whether there will be more extensions to the Contract, Respondent's then Deputy Minister assured that *"you [Claimant] will have more contracts with us."*[128]

---

[122] Exhibit C-28.

[123] Exhibit C-28.

[124] Exhibit C-17.

[125] Exhibit C-3; Exhibit C-28, p. 3, *"Budget verification of any expenditure that is Allotment process and payments are all prepared by Ministries and sent to MOF for approval. As they are checked in MOF and have no problem check is issue by the name of company and check is sent to central bank of Afghanistan to transfer the funds from Project bank account to the beneficiary account."*

[126] See also Exhibit C-39 which shows that the Presidency of Afghanistan was also aware and in agreement with these extensions.

[127] Exhibit C-28, p. 1-2: Claimant's email, 23 June 2014: *"are you waiting for more amendments to be signed before any dollar can be released?"*; Claimant's email, 27 June 2014:

*"for the sake of the project and trust in the ministry, we have agreed to arrange mobilization to Almaty even though we have no payments for previous work **and no contract for extensions**. We hope that the payments for previous work **and extensions could be arranged quickly** and we will highly rely on your support in these two matters."*

Mr. F. Qazizadah, Respondent's Deputy Ministry at the time replied on 28 June 2014: *"**we will do all to speed up ur** payment and **extension of ur contract. you will have more contracts with us.**"* (Emphasis added).

[128] Exhibit C-28.

216. The fact that the Parties have agreed for more extensions to occur was reiterated by Respondent on 27 September 2014: *"we agreed to extensions and they will come."*[129]

217. An Amendment no. 1 was thus concluded and on 27 October 2014, Respondent wrote to Claimant that another extension of 4 months was necessary and that it has *"informed"* the World Bank accordingly.[130]

218. It results from the contemporaneous documents that the World Bank had sometimes to intervene to prompt the conclusion of the amendments between Claimant and Respondent.[131]

219. This was confirmed by Respondent on 27 September 2014, who assured Claimant that extensions will occur as Respondent had received the World Bank's approval to allocate 3 million USD to Claimant's services under the CASA 1000. Respondent's confirmation reads as follows:

> *"You remember I told you that we have $3 million for your contract from the WB, it will all be paid to you through such extensions. We cannot do more than 3 or 4 months extension at a time because of budget ceiling per amendment but you will receive all $3 million by the end."*[132]

220. This statement came in reply to Claimant's complaints to Respondent about the delays of payment of its invoices and the non-conclusion of the amendments in time. Claimant had in fact threatened to invoice the no-charge services, which were conditional upon the timely conclusion of the amendments and timely payments. Put into context, it clearly results from Respondent's statement that:

   (i) It has committed to the extension of the contract for a total sum of USD 3 million;

   (ii) this USD 3 million encompassed the various extensions and all the services provided by Claimant, including during the possible gaps

---

[129] Exhibit C-36.

[130] Exhibit C-27. In this email to Claimant's, Mr. Qazizadah mentioned that *"we have **informed** the WB that we want to extend yur [sic]contract for another 4 months."* (Emphasis added).

The World Bank was following the relationship between Claimant and Respondent from the beginning. See, section 16.0 § 2 of the Minutes provided that *"the Client and the Consultant agreed that this contract is subject to the World Bank issuing of a No Objection Letter (NOL), and MEW Ministerial approval."* It is noteworthy that according to the Minutes, the Deputy Coordinator of Working Group for CASA 1000, Mr. Lashkari, participated in the Contract negotiations. The World Bank was also copied of Respondent's email to Claimant attaching a copy of the Minutes and the signed Contract, Exhibit C-22. *Adde* Exhibit 4 to the Application regarding Amendment no. 3.

[131] Exhibits C-33 and C-34.

[132] Exhibit C-36. Emphasis added. Adde, Exhibit C-2.

between the different amendments. In other words, the no-charge services provided during these gaps were in fact included in the USD 3 million.

221.  The Tribunal's above understanding of the Parties' email exchange is corroborated by another email exchange between Claimant and Respondent on 3 and 10 March 2015, respectively. On 3 March 2015, Claimant wrote an email to Respondent confirming what was agreed verbally. It summarized the Parties' agreement on the 4 following points:[133]

     (i)    Payment of overdue invoices under the Main Contract, and Amendments nos. 1, 2 and 3;

     (ii)   *"the World Bank has provided grant to the MEW in the amount of USD 3 (three) million towards [Claimant's] contract and **this amount will be paid in full** to finance [Claimant's] **continued** assistance";*

     (iii)  An amendment no. 4 will be concluded covering the period <u>until September or even December 2015</u> (i.e. between 3 months (at least) and 6 months), given the *"delays in processing of invoices and amendments <u>which are administrative in nature but will not impact the agreement</u>";* and

     (iv)   *"**in return**" (sic),* Claimant committed to continue its services to Respondent without interruption. *"UNICON will continue assisting Afghanistan notwithstanding administrative delays that may arise (see above) and will not suspend or otherwise put at risk CASA-1000 project. UNICON has agreed to these terms proposed to it by the MEW."*

222.  These 4 points were confirmed by Respondent in its email of 10 March 2015 where it replied: *"Agreed".* The Parties have thus agreed to the above 4 points according to Articles 609(2) and 610 of the Afghan Commercial Code, and the principle of performance of agreements in good faith under Article 43 of the GCC and Article 691 of the Afghan Civil Code.

223.  Finally, the contemporaneous documents establish that negotiations under the CASA-1000 Project were still ongoing in September 2015 (that is after the expiry of Amendment no. 3) and that the members of the Joint Working Group met in Alamty, Kazakhstan, on 18 September 2015.[134] The Parties' email exchange also indicate that CASA-1000 negotiations and meetings of the Joint Working Group lasted at least until June 2016.[135]

---

[133] Exhibit C-38.

[134] Exhibit C-41. *Adde,* Exhibit C-39.

[135] Exhibits C-40, C-43 and C-44. Exhibit C-43 indicates that Respondent was still seeking Claimant's assistance. In such case, besides the Parties' agreement for further extensions (encompassing Amendment no. 4) which may not exceed four months according to Respondent's own statement (Exhibit C-36), Claimant seems to

224. The Contract was a lump sum and Respondent has committed to conclude Amendment no. 4 for three to four months under the CASA-1000 Project.[136] Respondent has obtained the World Bank's approval to grant USD 3 million and committed to pay Claimant such amount. The fact that Respondent has decided on its own volition not to ask the World Bank for the replenishment of the remaining USD 359,104[137] should not be detrimental to Claimant.

225. According to Article 696(1) of the Civil Code, *"Contract shall be considered binding upon authorization, reversion from contract or modification thereof, without consent of both parties or provision of law, shall not be permissible."*

226. For the foregoing reasons, the Tribunal considers that Claimant is entitled to the payment by Respondent of USD 444,807 corresponding to the amount it would have received had Amendment no. 4 been concluded. Claimant's Relief sought under ¶ 86 (c) of the Statement of Claim is thus admitted.

227. Under these circumstances, Claimant's claim of USD 275,972 corresponding to the no-charge services for the period between 13 April 2013 and 23 May 2013, on the one hand, and 25 August 2014 and 23 October 2014, on the other hand, is tantamount to double counting. Indeed, the USD 3 million have actually taken into account the no-charges services that Claimant could possibly provide during the gap periods. Therefore, Claimant's Relief sought under Relief sought, ¶ 86 (d) is dismissed.[138]

### 3. *On Claimant's Claim for Additional Compensation for Harmful Actions, Extortion and Long-Term Harassment*

228. Regarding Claimant's claim for "additional compensations from Respondent's harmful actions, extortion and long-term harassment in the amounts to be determined by the Arbitrator" (SOC, ¶86 (f)), this claim is dismissed for the following reasons:

    (i)    The three-pronged liability conditions have not been substantiated by Claimant;

    (ii)    Corruption, bribery and extortion are wrongful actions under international law, national laws and well-established principles of international arbitration and trade usages. Assuming that the purported extortion and long-term harassment could have materialized Respondent's wrongful action, Claimant has not established that such wrongful action has caused it a damage beyond or other than the one it has suffered from Respondent's lack of payment of its overdue

---

have in fact provided actual services to Respondent upon the latter's request. Claimant's services after June 2015 constituted the consideration for the payment that Respondent may have made under Amendment no. 4.

[136] Exhibit C-36.

[137] Or to push the reasoning even further, Respondent's decision on its own volition to eventually not seek Claimant's services notwithstanding its previous agreement with Claimant should not be detrimental to Claimant.

[138] SOC ¶¶77-79, and ¶ 84.

invoice under Amendment no. 3 and the non-conclusion of Amendment no. 4. The Tribunal has already ordered Respondent to pay compensation for both claims under Amendment nos. 3 and 4.

(iii)    Therefore, by seeking additional compensation for the same damage, Claimant would in fact be seeking either double counting or punitive damages.[139] Such claim would contradict the well-anchored principle of *restitutio in integrum.*

(iv)    the Tribunal does not have the power under the arbitration agreement or the applicable law to grant either punitive damages or order double payment.

(v)    Assuming that Claimant would have suffered a moral damage, the burden lies upon it to prove such damage and its amount. The Tribunal does not have the power to relieve Claimant from its burden of proof nor to decide *ex aequo et bono* under the arbitration agreement.

(vi)    Finally, with respect to Claimant's reliance on Articles 776 and 780 of the Civil Code, these articles are under "Chapter 3 – Legal Events, Section 1- Harmful Act", i.e. torts and not contracts. Claimant has not established (i) whether these articles may apply to contract claims or are reserved to tort claims, and (ii) whether or not the Afghan law prohibits the cumulation of tort and contract claims.

229.    For the foregoing reasons, Claimant's claim for "additional compensations from Respondent's harmful actions, extortion and long-term harassment in the amounts to be determined by the Arbitrator" (SOC, ¶86 (f)) is dismissed.

### 4. *On the Claim for Interest*

230.    Claimant's claim for interest covered 3 types of delays of payment of:[140] (i) invoices under the Main Contract and Amendments nos. 1 and 2 as well as for the no-charge services between Contract and Amendment no. 1, and between Amendments nos. 1 and 2;[141] (ii) the amount of the invoice relating to Amendment no. 3; and (iii) the amount of Amendment no. 4. Claimant has submitted that it was seeking the application of simple interest and not compounded interest.

---

[139] Punitive or exemplary damages are usually granted in common law countries in three different circumstances: 1. When it is expressly so provided under the law; 2. in case of excessive, arbitrary or unconstitutional action on the part of a member of the administration; 3. where the defendant's conduct was calculated to make a profit which might exceed the plaintiff's remedy. *Rookes v. Barnard* (No.1) [1964], UKHL, A.C. 1129 (21 January 1964).

[140] Exhibit C-54.

[141] Claimant referred to these heads of claims as damages caused in 2014 claimed USD 115,908 as at the date of the Statement of Claim (SOC ¶¶ 84 and 86(e)(iii)).

231. The first claim (invoices under the Contract and Amendments nos. 1 and 2) is dismissed. Indeed, when the payment was made by Respondent, albeit with delay, Claimant has not requested the payment of the legal interest thereon. In addition, as mentioned above, when the Parties have agreed that Claimant will receive a total amount of USD 3 million, they have also anticipated that payment will occur with delays due to administrative hurdles.[142] Therefore, Claimant is deemed to have waived its right to claim legal interest for the delays of payments of its invoices under the Contract and Amendments nos. 1 and 2.

232. Regarding the second claim (the amount of the invoice relating to Amendment no. 3), Claimant is entitled to the payment of the 6% per annum interest rate in accordance with Article 41.2 of Amendment no. 3 and Article 600 of the Commercial Code.[143] The starting point of the interest to run is the date the payment fell due, i.e. 45 days after the date of invoice CK 16,[144] in accordance with Article 598 of the Commercial Code which provides that:

> "An interest on commercial debts shall be calculated after expiration of the designated days, or if a period is designated, since the date of the notice."

233. Accordingly, the interest rate on invoice no. CK16 under Amendment no. 3 of USD 444,807 shall thus start to run on 15 August 2015 until full payment. The interest rate is 6% per annum and shall be calculated based on the amount of USD 444,807. From 15 August 2015 to date (23 November 2022), the interest on Invoice CK16 is USD 200,914.87.[145]

234. With respect to the third claim (the amount of Amendment no. 4), the interest rate applicable is the one provided under Amendment no. 3. The starting point for the interest to run is the date of the award and not the date where Amendment no. 4 ought to have been concluded. The right of Claimant to the amount of Amendment no. 4 was constituted when the Tribunal ruled that Claimant was entitled to compensation by Respondent for the non-conclusion of Amendment no. 4. Thus, the starting point for the interest to run is the date of the award and is due until full payment.

---

[142] Exhibit C-38 : *"MEW commits that UNICON will eventually receive a total of USD 3,000,000 through amendments. **At the same time, MEW notes that there can be delays in processing of invoices and amendments which are administrative in nature but will not impact the agreement."** (Emphasis added)*

[143] Exhibit CL-04.

[144] Article 42 of the GCC provides that the interest rate shall run if the invoice is not paid within 15 days after the due date of payment stated at Article 41.2.2 of the SCC. The initial 60 days provided by Article 41.2.2 of the SCC were reduced to 30 days under Article 41.2 of Amendment no. 3. Exhibits C-1 and C-7 respectively. See also Amendment no. 1, Article 41.2.2. (Exhibit C-05). Adde, Amendment no. 2, Exhibit C-06.

[145] USD 444,807 * 0.017% (6% *365 days) * 2657 days (from 15 August 2015 to 23 November 2022).

235. Finally, the interest rate for all the above sums is a simple interest and not a compound interest.[146]

### D.   Costs of the Arbitration

#### 1.   Claimant's Position

236. On 16 August 2022, Claimant submitted its Submissions on Costs. It explained that Mr. Daveltkhan was neither employed nor received any benefits from Claimant or its shareholder, nor possessed any other interests in the firm. Mr. Davletkhan was an external party to Claimant and was instructed by it by separate letters of engagements on an individual basis. It submitted that the costs of arbitration commenced when the attempts of amicable settlement were triggered under Article 44.1 of the GCC prior to the filing of the Notice of Dispute under Article 44.2 GCC.[147]

237. Claimant stated that it was compelled to go through this arbitration process to protect its rights and recover its long-standing debts and should not be penalised by having to pay for the process itself. Claimant should thus be awarded all its costs and the Tribunal should order Respondent to pay Claimant:[148]

 a)  USD 264,600.00 as legal representation costs; and

 b)  USD 40,837.00, as arbitration costs.

238. On 23 November 2022, the Sole Arbitration informed the Parties that she has spent a total of 103.10 hours in this matter and sought payment in equal share by the Parties of the EUR 11,471 which corresponds to the remaining amount of her costs and expenses in accordance with ¶ 58 of the Terms of Appointment. The Sole Arbitrator emphasised that this amount shall be included in the award on costs. Claimant issued the payment of the entire amount on the same date.

239. EUR 11,471 is equivalent to USD 11,936 after conversion at the applicable exchange rate.

#### 2.   The Tribunal's Decision

240. It is well-established that arbitral tribunals have a discretionary power to fix the costs of arbitration. It is also a well-established principle that, subject to the circumstances of each case, the "costs should follow the event", i.e., the arbitration costs should be borne by the

---

[146] SOC ¶81.

[147] Submissions on costs ¶¶4-5.

[148] Submissions on costs ¶6.

unsuccessful party,[149] here Respondent. In ruling on the costs of arbitration, arbitral tribunals are guided by the principle of reasonableness.

241. Based on these principles, Article 42 of the UNCITRAL Rules and taking into consideration the circumstances of the case, since Claimant was successful in the majority of its claims, the Arbitral Tribunal decides that Claimant is entitled to payment by Respondent of:

    1.  70% of its legal representation costs, that is USD 184,800.[150]

    2.  the entire amount of its arbitration costs (the ICC costs and the Arbitrator's fees): USD 52,773 (USD 40,837 + USD 11,936).[151]

242. Respondent is ordered to pay the abovementioned amounts of the arbitration costs with interest thereon from the date of the award until full payment. The applicable interest rate is the legal interest in force under the Laws of Afghanistan at the date of the award. This interest is simple and not compound.

## VII. DECISION

243. For all the foregoing reasons, the Tribunal:

    1.  **DECLARES** that the place/seat of arbitration is Paris, France;

    2.  **DECLARES** that the date of commencement of these proceedings is 18 September 2021;

    3.  **DECLARES** that the Tribunal has jurisdiction to rule over the claims brought by Claimant against the State of Afghanistan in the present proceedings;

    4.  **DECLARES** that the Tribunal has jurisdiction to rule over the claims brought by Claimant against the Ministry of Energy and Water in the present proceedings;

    5.  **DECLARES** that Respondent is liable to pay Claimant the total amount of the invoice CK16 under Amendment no.3 of USD 444,807;

    6.  **DECLARES** that Respondent is liable to pay Claimant a 6% interest per annum on the amount of USD 444,807 under Amendment no. 3 starting from 15 August 2015 until full payment. The amount of this interest as at the date of the award is USD 200,914.87;

---

[149] See also Article 42 of the UNCITRAL Rules.

[150] USD 264,000 * 70%.

[151] This amount corresponds to the equivalent of EUR 11,471 which were paid by Claimant on 23 November 2022 after the conversion at the exchange rate.

7. **DECLARES** that Respondent is liable to pay Claimant USD 444,807 as compensation for the breach of its obligation to perform Amendment no.4, with interest thereon of 6% per annum from the date of the award until full payment;

8. **DECLARES** that Respondent is liable to pay Claimant USD 184,800 corresponding to 70% of its legal representation costs, and USD 52,773 corresponding to the entire amount of its arbitration costs, with interest thereon from the date of the award until full payment. The interest rate in this respect is the one applicable in Afghanistan at the date of the award.

9. **DISMISSES** all other claims.

Issued in Paris, France on 23 November 2022

**Sally El Sawah**
*Sole Arbitrator*

64

ANNEXES


Annex 1

**Annex 2**